**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-328-TSC** |
| **ROBERT SCOTT PALMER,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.   For the reasons set forth herein, the government requests that this Court sentence Robert Scott Palmer to 63 months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

### I.      INTRODUCTION

Palmer participated in the January 6, 2021 Capitol riot, a violent attack on the United States Capitol that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage.   Palmer directly contributed to that violence.   After watching other rioters repeatedly assaulting the officers defending the Lower West Terrace entrance to the Capitol – a scene that horrified the rest of the world – Palmer chose to join in.   Palmer made his way to the front line of the rioters and proceeded to attack the officers.   Palmer first threw a wooden plank at the officers.   He then sprayed the contents of a fire extinguisher at the officers, and when it was empty, hurled it at the officers.   Palmer then rooted around for additional materials with which to

1

assault the police, including throwing the fire extinguisher a second time.   At this time, after his assaults had occurred, Palmer was pepper sprayed by law enforcement.

But the pepper spray only deterred Palmer for a short while.   A few minutes later, on the West Plaza, Palmer assaulted another group of law enforcement officers with a 4-5 foot pole.   As he threw the pole like a spear at the officers, one of them fired a non-lethal projectile at Palmer, hitting him in the abdomen.   Palmer retreated and lay on the ground for a few minutes.   When he got up, Palmer showed off his injury to the crowd, shouting falsely that he had been shot merely for yelling at the police, when in fact he had provoked the injury by his own assault.   Thereafter, in statements to a reporter, Palmer admitted that his goal was to subvert a democratic election and that he hoped for military intervention to overturn the election in order to keep the losing candidate in power.

Defendant's repeated violent assaults on law enforcement for the purpose of overturning a democratic election warrant a significant term of imprisonment.

Moreover, after his guilty plea, Palmer posted a public statement on the Internet falsely claiming that his actions on January 6 were purely defensive, and falsely claiming that his assaults on law enforcement were a reaction to – rather than the cause of – him being tear gassed and shot with a non-lethal projectile.   Palmer's post-plea falsehoods demonstrate a lack of remorse and are inconsistent with an acceptance of responsibility.

At the same time, the government recognizes that unlike other Capitol defendants, Palmer pled guilty relatively early, turned himself into law enforcement, and voluntarily met with the FBI to provide truthful information.   Accordingly, the government recommends that the Court sentence Palmer to 63 months in custody, at the low end of the Sentencing Guideline range as

calculated by the U.S. Probation Office and as contemplated in the parties' plea agreement.   A 63-month sentence reflects the gravity of Palmer's conduct, his lack of remorse, and the need to deter Palmer and others from similar conduct in the future, while at the same time recognizing Palmer's early decision to plead guilty and avoid the need for a trial.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  The January 6, 2021, Attack on the Capitol

On January 6, 2021, several hundred rioters, Palmer among them, attacked the U.S. Capitol in an effort to disrupt the peaceful transfer of power after the November 3, 2020 Presidential election.   Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked the place—vandalizing, damaging, and/or stealing artwork, furniture, and other property.   Although the facts and the circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day.   *See United States v. Matthew Mazzocco*, 21-cr-54 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

The day started out calmly enough.   As set forth in the PSR and the Statement of Offense incorporated into Palmer's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol.   Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election.   By approximately 1:30 p.m., the House and Senate

adjourned to separate chambers to resolve a particular objection.   Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.   Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside.   At approximately 2:00 p.m., certain individuals unlawfully forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building.   Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.   Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers.   All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured.   Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.   *See* Statement of Offense at ¶¶ 1-3; PSR at ¶¶ 10-16.

***Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building***

The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line. *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT").  The entrance usually consists of a flight of stairs leading to a doorway.  On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long.  That tunnel led to two sets of metal swinging doors inset with glass.  On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.  The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building.  This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day.  *See* Figure A.[1]

---

[1] Figure A is an image from the website "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.   The archway is circled in red.



Fig. A

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.   Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department (MPD), were arrayed inside the doorway and guarding the entrance.   Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.   The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles and other items.   Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray.   At a later hearing on the events of January

6, Congressman Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people.   And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me.   So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in.   That's about from the distance where I'm sitting here on the dais to that back wall.   And from that office in close proximity to where you all held the line, I listened to you struggle.   I listened to you yelling out to one another.   I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall.   And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight."   Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at   https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers.   The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone and the previously-mentioned assault of Officer Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force.   Capitol Police Sgt. Aquilino Gonell, who was present

in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle. *Id.* (Statement of Sgt. Aquilino Gonell)

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor. MPD Officer Michael Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service. *Id.* (Statement of Officer Michael Fanone)

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5 pm.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area. It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including potential harm to members of Congress.

### Injuries and Property Damage Caused by the January 6, 2021 Attack

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a

grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.").

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id.* at 27-30. Other rioters, like Palmer, transformed ordinary objects, such as sticks, flag poles, fire extinguishers and barricades, into dangerous weapons.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House

Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). As set forth in the Statement of Offense, the attack resulted in substantial damage to the U.S. Capitol, requiring the expenditure of more than $1.4 million. *See* PSR, ¶ 15.

**B. Palmer's Role in the January 6, 2021, Attack on the Capitol**

Palmer traveled to Washington, D.C. by plane from his home near Tampa, Florida. After attending the former President's rally, Palmer made his way to the U.S. Capitol, wearing a "Florida for Trump" hat and a jacket designed like the flag of the United States, earning him the nickname on social media of "FloridaFlagJacket."

At approximately 4:00 p.m., Palmer, visible in his distinct clothing, was on the Upper West Terrace, leaning over a railing, and holding a sign stating, "Biden is a Pedophile." *See* Exhibit 1

at 2:22, 2:36, 2:58, 4:03, and 8:05.[2]



Fig. B

From his vantage point, Palmer had an excellent view of the rioters attacking the police officers with pepper spray, metal rods and stolen riot shields, among other things, along with group chants of "Pull the cops out!" and "Drag them out!"   *See, e.g.,* Exhibit 2 at :58 – 1:02, 1:29 – 1:32; 5:05 – 5:09, 8:02 – 8:46.[3]   *See also* Exhibit 1 at 1:40 – 24:42.   Along with other rioters, Palmer cheered on the violence, at one point raising his arm up in the air in support as rioters shoved a large flagpole into the tunnel.   *See, e.g.,* Exh. 2 at :36 - :44.

---

[2] Exhibit 1 is a publicly available video entitled "DC 1 6 21(2)" available at https://youtu.be/zcRFEYnHWyM. Figure B is a screenshot from 2:58 into the video.
[3] Exhibit 2 is a publicly available video entitled "That's One Big Flag! / The Storm Arrived Pt. 7" available at https://youtu.be/NUoBiRXZs5Q.   Figure C is a screenshot from :37 into the video.



Fig. C

At approximately 4:30 p.m., Palmer was still at the railing, watching as one of the MPD officers was pulled out of the LWT tunnel and attacked by rioters.   See Exhibit 3.[4]



Fig. D

Deciding that cheering on the violence was not enough, Palmer chose to make it worse. By approximately 4:50 p.m., Palmer had come down to the LWT and was heading towards the tunnel.   As he approached, Palmer saw other rioters assaulting police with items such as baseball

---

[4] Exhibit 3 is a publicly available video entitled "Officer pulled into crowd Capitol Protest/Riot 1/6/21" available at https://youtu.be/FjV7dNQEMcY.   Figure D is a screenshot from :03 into the video.

bats, helmets, batons, traffic barriers, pepper spray, wooden and metal poles, table legs and a wooden drawer.  *See, e.g.,* Exhibit 4 at :17 - 4:00.[5]   The scene at the tunnel as Palmer approached is shown in Figure E.



Fig. E

At approximately 4:54 p.m., Palmer was on the steps leading to the LWT tunnel, having acquired a wooden plank.   He threw the plank like a spear at the officers, and it landed atop a riot shield the police were holding over themselves.  *See* Exhibit 5 at :47 - :51.[6]  *See also* Exh. 4 at 4:29-4:33.

---

[5]  Exhibit 4 is a video obtained from the cellphone of another Capitol Riot defendant, in a file called IMG_1610.mov.   Figure E is a screenshot from 3:51 into the video.

[6]  Exhibit 5 is a publicly available video from Getty Images, designated with the number 1295311711.   Figure F is a screenshot from :48 into the video.



Fig. F

Palmer next moved up the steps, towards the officers, and joined the front line of rioters attacking the police.   At approximately 4:54 p.m., another rioter sprayed a fire extinguisher at the police. *See* Exh. 4 at 5:31-5:35.   After the cloud of particles cleared, Palmer retrieved the fire extinguisher and emptied its contents at the officers.   *See* Exh. 1, at 26:07 (Figure G); *see also* Exh. 4 at 5:51-5:56.



Fig. G

Once the fire extinguisher was empty, as other rioters continued their attacks, Palmer threw the fire extinguisher at the officers, and it hit one of their riot shields before dropping to the ground. *See* Exh. 1, at 26:14 (Figure H); *see also* Exh. 4 at 5:56-6:05.   The video shows that no law

14

enforcement officer had touched or even threatened to touch Palmer prior to these attacks.



Fig. H

At approximately 4:56 p.m., Palmer cast around for additional items with which he could assault the police.   He took hold of a long piece of scaffolding wrapped in canvas and pushed it at the legs of the police.   He picked up the fire extinguisher he had just thrown and threw it again at the police.   He picked up an orange traffic barrier and threw it towards the police, missing them. *See* Exhibit 6;[7] *see also* Exh. 4 at 6:22-24.



Fig. I

Palmer has admitted that based on the size and weight of the plank and the fire extinguisher,

---

[7] Exhibit 6 is a clip of body-worn camera footage from an officer inside the LWT tunnel.   Figure I is a screenshot from :10 into the video clip.

and the speed and force with which they were thrown, these objects were capable of inflicting serious bodily injury.   *See* Statement of Offense, ¶ 10; PSR at ¶¶ 19.   Fortunately, however, no law enforcement officer appear to have suffered any bodily injury as a direct result of Palmer's conduct.

Shortly thereafter, Palmer retreated from the tunnel, apparently as a result of OC spray. *See* Figure J;[8] *see also* Exh. 4 at 6:34.   Note that any OC spray occurred *after* Palmer's attacks on law enforcement.



Fig. J

By approximately 5:10 p.m., officers had cleared rioters out of the LWT and were making efforts to clear rioters out of the Upper West Plaza, which is below the LWT.   Figure K shows the relative locations of the LWT and the Upper West Plaza.[9]

---

[8] Figure J is a publicly available photo taken by photographer Lev Radin, designated DSC09712.
[9] Original map publicly available at https://drive.google.com/u/0/uc?id=1aQFDTYoTsYLRJ3qbPS7-4uMKEWtM6iRQ&export=download and credited to @ne0ndistraction and @SansaStark525.



Fig. K

Undeterred by the events on the LWT, Palmer continued to confront police while on the Upper West Plaza.

At approximately 5:14 p.m., Virginia State Police ("VSP") officers occupied an elevated platform on the Upper West Plaza and were assisting with the task of clearing rioters. At approximately 5:15 p.m., on the Upper West Plaza, Palmer obtained a stick or pole, approximately 4-5 feet long.   *See* Exhibit 7 at :12 - :16.[10]



Fig. L

---

[10] Exhibit 7 is a clip from a Closed Circuit Video ("CCV") camera on the Capitol grounds.   Figure L is a screenshot from :13 into the video clip.

With the pole in hand, Palmer approached a group of VSP officers.   *Id*. at :16 - :25.   As he approached, the officers gave him direct commands to drop the pole.   Palmer ignored the warnings, even after one officer pointed his flashlight, which was attached to the officer's "less than lethal" weapon, at Palmer.   Palmer continued to approach, screaming obscenities at the police, and continuing to ignore direct warnings.   When he got close, Palmer threw the pole like a spear at the officers.   As Palmer did so, one of the VSP officers fired a projectile, a 40mm "less than lethal munition," hitting Palmer in the abdomen.   *See* Exhibit 8 at :36.[11]   The pole struck the platform below where the VSP officers stood.[12]



Fig. M

After being hit with the projectile, Palmer retreated, and lay down on the West Plaza.   *See* Figure N.[13]   See also Exh. 8 at :36 – 1:11.

---

[11]  Exhibit 8 is a clip from a CCV camera atop the Capitol.   Figure M is a screenshot from :24 into the clip.
[12]  While Palmer has not been charged with this additional assault on law enforcement, it is relevant conduct that the Court should consider in determining the appropriate sentence.   *See* U.S.S.G. § 1B1.3.
[13]  Figure N is a publicly available photo taken by photographer Lev Radin and designated CQ8T6502.

18



Fig. N

Palmer arose a few minutes later and began showing off his injury.   Attempting to portray himself as the victim, rather than the aggressor, Palmer pointed at his abdomen, shouting, "This is the United States.   This is what our country is doing to its citizens."   *See* Exhibit 9 at :07 –:11.[14]



Fig. O

Palmer was then interviewed by a camera crew on the West Plaza.   Palmer again showed the bruise on his abdomen and again lied about the circumstances of his injury, claiming he had

---

[14] Exhibit 9 is a publicly available YouTube video entitled "Rubber Bullets Fired Outside the U.S. Capitol" found at https://youtu.be/jvEWD5aoyws.   Figure O is a screenshot from :08 into the video.

been shot with a rubber bullet just for "yelling at them" and that they shot him for "nothing, absolutely nothing."   *See* Exhibit 10 at :09 - :17.[15]   Palmer also admitted his purpose in attacking the police on January 6 was to keep the losing presidential candidate in power and somehow replace the Vice President.   When asked what his "best case scenario" would be, Palmer said that it would be to "call in the military" and that "Trump does not step down."   When asked how the situation could be "made right," Palmer said "Keeping Trump in office" and getting a "new Vice President" who had "pardon the expression, balls.   OK.   Call in the military."   *See id*. at :25 - :47.   These statements, taken in the context of what actually happened on January 6, 2021, when Palmer and so many others engaged in violence directed at influencing Government action, cannot be ignored.



Fig. P

On March 4, 2021, after Palmer had been identified by an online sleuth, Palmer was contacted by a reporter for the Huffington Post.   Palmer told the reporter he had done nothing to justify being

---

[15]  Exhibit 10 is an excerpt from a publicly available video entitled "1_06_21 Full LIVE #1_ Tear Gas and Flash Bangs Used to End US Capital Occupation, WA DC", available at https://youtu.be/IXT0AKtYjSg   Figure P is a screenshot from :22 into the video excerpt.   Note that an individual with a megaphone was speaking near the recording device, and sometimes drowns out Palmer's audio.

struck with a police munition.   He also told the reporter "I didn't do anything wrong."[16]

Palmer pled guilty on October 4, 2021 and was remanded into custody.   Thereafter, Palmer instructed a friend to put a post on a website called "GiveSendGo.com" seeking donations from the public.   In the post, among other things, Palmer stated "[w]hile protesting the election I was shot at with rubber bullets and sprayed with tear gas.   I didn't even go through the barricade into the capitol.   I did, however, go *on the defense* and throw a fire extinguisher at the police as I could not believe *they had just shot me*."   *See* PSR ¶ 28; Figure Q (emphasis added);[17]   A November 2, 2021, jail call demonstrates that Palmer approved the language of this post, including specifically the references to going "on the defense" and "they had just shot me."   While Palmer corrected details such as the amount of legal fees, he made no other changes to the language, and then asked for the post to be disseminated as much as possible, despite the friend's suggestion that he wait until after sentencing because the post could made it look like he was "not remorseful." *See* Exhibit 11 at 1:12 - 8:00.[18]

---

[16] Ryan J. Reilly and Jesselyn Cook, "Revealed: The Star-Spangled Trumper Filmed Attacking Cops At The Capitol" dated March 5, 2021, and updated on March 19, 2021, found at https://www.huffpost.com/entry/robert-palmer-capitol-attack-sedition-hunters.

[17] Figure Q is a redacted screenshot from the website https://www.givesendgo.com/HelppatriotrobP (last visited November 12, 2021).

[18] Exhibit 11 is a consensually monitored jail call between Palmer and a friend on November 2, 2021 at approximately 5:42 p.m.   In a November 6, 2021 jail call, Palmer was even more explicit, telling a friend that "I was attacked first" and "by the time I got there, the police were just, like, attacking everybody."   *See* Exhibit 12 (November 6 jail call) at 9:45 – 10:29.



Fig. Q

Subsequent to the Probation department's issuance of the draft pre-sentence report on November 12, 2021, the post was taken down. Based on defense counsel's representation that all funds raised on the website have been returned—a representation that investigation has corroborated— the Government is not recommending a fine as part of the sentence.

### III.    PROCEDURAL BACKGROUND

The Department of Justice began its investigation into the attack on the U.S. Capitol mere hours after the breach occurred on January 6, 2021.  As of December 10, 2021, the Department has brought charges by complaint, information, or indictment against approximately 697

22

defendants.  The charges range from Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2), and Assaulting, Resisting or Impeding Law Enforcement, in violation of 18 U.S.C. § 111(a) and (b), to Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a) and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e).   Of those defendants, as of December 10, 2021, at least 138 have pleaded guilty to misdemeanor charges and at least 23 have pleaded guilty to felony charges.

On March 12, 2021, Palmer was charged by complaint with violating 18 U.S.C. §§ 111(a)(1) and (b), 231(a)(3), 2, and 1752(a)(1), (2), and (4) and (b)(1)(A).   On March 17, 2021, voluntarily surrendered to law enforcement.   On April 28, 2021, a federal grand jury indicted Palmer and charged him with the same crimes as well as violations of 40 U.S.C. §§ 5104(e)(2)(D) and (F).   In late July, Palmer, through counsel, indicated a desire to plead guilty.   As noted, his guilty plea was entered on October 4, 2021, and Palmer was remanded into custody.

## IV.   STATUTORY PENALTIES

The defendant now faces sentencing on a single count of 18 U.S.C. § 111(b).   As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

### A.  Offense Level Computation

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."   *United States v. Gall*, 552 U.S. 38, 49 (2007).   "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence.

23

*Id.* at 49.   The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing.   *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.[19] According to the PSR, the U.S. Probation Office calculated Palmer's adjusted offense level under the Sentencing Guidelines as follows:

| U.S.S.G. § 2A2.2(a) | Base Offense Level | [14][20] |
| U.S.S.G. § 2A2.2(b)(2)(B) | Use of Dangerous Weapon | [+4] |
| U.S.S.G. § 2A2.2(b)(7) | Violation of 111(b) | [+2] |
| U.S.S.G. § 3A1.2(b) | Official Victim | [+6] |
| | Total | [26] |

*See* PSR at ¶¶ 33-43.

### B.  The Acceptance of Responsibility Reduction is not Warranted

The Probation Office determined that the adjustment for acceptance of responsibility is not warranted due to the contents of Palmer's post-plea fundraising post, particularly his references to his conduct in the instant offense.   *See* PSR at ¶¶ 31-32, 42.   The government agrees.

U.S.S.G. § 3E1.1(a) provides that if a defendant "clearly" demonstrates acceptance of responsibility for his offense, the offense level can be decreased by two levels.   If a defendant qualifies under § 3E1.1(a), for offense levels of 16 or more, an additional 1 level decrease is available upon the government's motion.   *See* U.S.S.G. § 3E1.1(b).

---

[19]  Based on the facts and circumstances of Palmer's case, the government does not seek imposition of an upward departure pursuant to U.S.S.G. § 3A1.4, n.4 (*see* Plea Agreement at ¶5(C)), because a sentence within the Guidelines range as determined in the PSR is sufficient, but not greater than necessary, to comply with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a)(2).

[20]  The starting point for a violation of 18 U.S.C. § 111 is U.S.S.G. § 2A2.4.   Because the conduct constituted aggravated assault, the cross-reference in U.S.S.G. § 2A2.4(c)(1) requires the application of U.S.S.G. § 2A2.2.

While entry of a guilty plea and admitting the conduct comprising the offense of conviction and all relevant conduct is "significant" evidence of acceptance of responsibility, such evidence can be outweighed by "conduct of the defendant that is inconsistent with such acceptance of responsibility."  *See* U.S.S.G. § 3E1.1, cmt. 3.  For that reason, the Sentencing Guidelines specifically state that "[a] defendant who enters a guilty plea is not entitled to an adjustment under [§ 3E1.1] as a matter of right."  *Id.*

For the same reason, Palmer's plea agreement requires that he demonstrate acceptance of responsibility not just at the time of his plea, but also during the period between his plea and his sentencing.  The agreement specifically states that the government would only agree to the 2-level reduction of § 3E1.1 if Palmer "clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through [his] allocution, adherence to every provision of this agreement, *and conduct between entry of the plea and imposition of the sentence*."  Plea Agreement, at 3 (emphasis added).[21]

Courts routinely deny the acceptance of responsibility reduction to defendants whose post-plea conduct belies their claims of contrition, such as when they attempt to blame others for their conduct.  For example, in *United States v. Wineman*, 625 F.3d 536 (8th Cir. 2010), the defendant pled guilty to a drug conspiracy.  Twenty days after his guilty plea, however, the defendant created an internet post in which he blamed his crime on the "addicts" who bought his products and the officials who denied him disability benefits, thus necessitating his drug dealing.  *Id.* at 537-38. The sentencing court found that the internet post was "inconsistent with any acceptance of responsibility" by the defendant.  *Id.* at 539.  *See also United States v. Godfrey*, 863 F.3d 1088

---

[21] The plea agreement goes on to note that the additional 1-level reduction would only be appropriate if Palmer clearly accepted responsibility to the satisfaction of the government.  *Id.*

(8th Cir. 2017) (defendant denied acceptance reduction based on repeated post-plea false statements claiming to have acted in self-defense or to have discharged firearm in air, claims which were contradicted by surveillance video and physical evidence); *United States v. Jeffries*, 569 F.3d 873 (8th Cir. 2009) (defendant who pled guilty to abusive sexual conduct denied acceptance reduction based on letters to probation office and sentencing judge denying any use of force and claiming that the relationship was consensual); *United States v. Guerrero*, 768 F.3d 351 (5th Cir. 2014) (defendant convicted of assaulting corrections officer denied acceptance reduction for telling probation that he felt the officer "disrespected" him and that "men have to understand the consequences of disrespecting another man").

Palmer's fundraising post warrants the denial of the acceptance reduction.   It is demonstrably false – Palmer was shot with the non-lethal ammunition *after* his attacks on law enforcement, and none of his assaults on law enforcement, including his assault with the fire extinguisher, were defensive.   (As a falsity transmitted by wire, Palmer has arguably also engaged in post-plea "additional criminal conduct"—that is wire fraud in violation of 18 U.S.C. § 1343— that provides an additional basis not to apply any reduction for acceptance of responsibility.   *See* Plea Agreement, at 3.)    More importantly, the fundraising post demonstrates a complete lack of remorse.   On January 6, Palmer attacked the police without any provocation.   He was the aggressor.   Blaming the police for his own choices and falsely claiming that he was acting "defensively" is flatly inconsistent with Palmer taking responsibility for his actions.[22]

---

[22] Palmer's post-plea conduct denying responsibility for his crimes on January 6 alters his Guidelines range from 46-57 months (with a three-level reduction under U.S.S.G. §3E1.1) to 63-78 months (with no reduction under U.S.S.G. §3E1.1).   As discussed *infra*, the number of aggravating factors in Palmer's case would typically warrant a mid- to high-end Guidelines sentence.   Given the substantial increase to the Guidelines range that results from not applying any reduction for acceptance of responsibility, a sentence at the low-end of the 63-78 range is "sufficient, but not greater than necessary" to fulfill the purposes of sentencing in 18 U.S.C. § 3553(a)(2).   If the Court instead accords Palmer a two-level reduction for acceptance of responsibility, the government will not move for the third

The Probation Office calculated Palmer's criminal history as a category I, which is not disputed.  PSR at ¶ 50.  Accordingly, the government agrees with the Probation Office's calculation that Palmer's total offense level is 26, and his corresponding Guidelines imprisonment range is 63-78 months.  PSR at ¶¶ 111.  Palmer's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the Probation Office's calculation.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).  Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).  As described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual who participated in the riot did so under the most extreme of circumstances, to which

---

acceptance point under U.S.S.G. § 3E1.1(b), and anticipates changing its low-end recommendation.

their conduct directly contributed.   Anyone who made it to the Capitol would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air.   Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with law enforcement.

While looking at the defendant's individual conduct, we must assess such conduct on a spectrum.   This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition.   While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

As set forth in the Statement of Offense, Palmer and the other rioters successfully shut down the certification of the electoral vote count for several hours, as members of Congress and their staff were forced to take shelter from the violence.   As noted above, the rioters injured over a hundred law enforcement officers and terrified individuals on scene that day, leaving significant emotional scars.   They destroyed over $1.4 million in property.   This number understates the extent of the property damage, as it does not include the irreparable and unquantifiable damage to

artwork, statues, and other artifacts that were stolen or damaged.

The nature and circumstances of the Defendant's crimes weigh heavily towards a significant term of incarceration.   Palmer purposefully joined a large group of rioters with the specific intent of interfering with the nation's electoral process.   In doing so, Palmer and others not only imperiled core democratic functions but also collectively caused enormous emotional, physical, and financial injuries along the way.

Like every other rioter, Palmer contributed to the collective threat to democracy, physical safety, emotional well-being, and property on January 6, 2021.   But Palmer is among the most serious offenders because Palmer repeatedly chose to use violence.   Palmer, like every other person in this country, has the right to peaceably assemble and protest.   What he cannot do is use violence against officers defending the Capitol in order to stop Congress from certifying the results of a lawful election.

While Palmer may have come to D.C. as a protester, he chose to become a violent rioter. Palmer's assaults were not spontaneous; they came after at least an hour of watching other rioters assaulting the police, seeing that the police were outnumbered and surrounded.   Palmer did not stumble into a bad situation; knowing exactly what was happening to the officers in the LWT tunnel, Palmer chose to get closer and physically attack.   There was nothing "defensive" about his conduct.   His attacks were deliberate and premeditated, took place over an extended period of time, and cannot be ascribed to the heat of the moment.

Nor did Palmer stop at one attack.   He chose to engage in violence repeatedly, and even after the OC spray.   Moreover, unlike the rioters who assaulted law enforcement with their hands, Palmer chose to use dangerous weapons capable of causing serious bodily injury.

Finally, Palmer's violence was in pursuit of his political goal of subverting a democratic election and the peaceful transition of power.

Palmer's actions on January 6 did not just violate the law, they showed an absolute disregard for the rule of law.   Accordingly, the nature and circumstances of the offense amply support the recommended 63-month sentence.

**B.        The History and Characteristics of the Defendant**

As set forth in the PSR, Palmer has a number of criminal convictions for Petit Theft, DUI, Battery, Organized Fraud, and Grand Theft.   Due to the age of these convictions, he has no criminal history points, but the number and nature of these convictions demonstrate a propensity for deceptive conduct and a history of a violating the law.

More recently, Palmer's statements – both on January 6 and up to the present -- suggest a distinct lack of remorse for his conduct, a tenuous relationship with truth, and a willingness to repeat falsehoods for personal benefit.   While Palmer is, of course, free to express his beliefs, he is not free from the consequences of those statements when they bear directly on the appropriate sentence in this case.

Within minutes of his final assault on law enforcement on January 6, Palmer was loudly proclaiming to anyone who would listen that he had been shot "just for yelling" at the police. Palmer knew this was false – the VSP officer who fired at him did so only because Palmer was attacking with a 4-5 foot pole and had refused repeated direct commands to stay away from the officer.

Two months later, Palmer repeated these falsehoods when interviewed by the press, claiming that he had done "nothing" to justify having been shot and had "done nothing wrong"

during the riot.

Palmer's falsehoods continued even after his guilty plea.   In his fundraising post, Palmer falsely asserts that he threw the fire extinguisher at the police as a reaction to having been shot by them.   But Palmer's assault with the fire extinguisher occurred well before he was shot.   More importantly, Palmer's conduct was not "defensive" – nothing provoked his attacks on law enforcement other than his own anger.

Palmer has not simply confused the sequence of events.   Palmer's fundraising post is just the latest in a series of lies Palmer has told to portray himself as a victim, rather than an aggressor, on January 6.   That he continued telling these lies, even after pleading guilty, in order to persuade people to donate money to him reflects poorly on his character and is inconsistent with an acceptance of responsibility.

To his credit, Palmer has had stable employment and has complied with his conditions of release.   The government also notes that Palmer consented to a search of his cellphone and provided a full confession to federal agents when they interviewed him after his arrest.   Most importantly, through his attorney, Palmer expressed his desire to plead guilty relatively quickly and was one of the first felony defendants to do so.   For these reasons, the government is recommending a sentence at the low end of the applicable guideline range.[23]

## C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law.   "The violence and destruction of property at the U.S. Capitol on January 6

---

[23] As noted above, *see* note 22 *supra*, a low-end Guidelines sentence would be inappropriately lenient if the Court applies a reduction for acceptance of responsibility under U.S.S.G. § 3E1.1.

showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[24]   As with the nature and circumstances of the offense, this factor supports a significant sentence of incarceration.   As Palmer entered the Capitol grounds and watched law enforcement officers being assaulted, it was abundantly clear to him that lawmakers, and the law enforcement officers who tried to protect them, were under siege by others similarly willing to use force to undermine the election.   Law enforcement officers were overwhelmed, outnumbered, and in some cases, in serious danger.   Palmer directly, and physically, added to that danger by his use of violence.   Assaulting law enforcement officers with a dangerous weapon is the epitome of disrespect for the law.

Moreover, by the time Palmer arrived in Washington, D.C., Palmer was aware not only that his preferred candidate had lost the election, but that legal challenges had been rejected by the courts of the various states and the United States.   In this context, Palmer's statements regarding a desire for the military to intervene in the election demonstrate his awareness that that the only way to keep his preferred candidate in power was through the use of force, a desire completely antithetical to democracy and the rule of law.

The government submits that this factor also requires a lengthy sentence of imprisonment. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that assaults on police officers are not taken seriously.   In this way, a lesser sentence could encourage further abuses.   *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

---

[24] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

**D.      The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others.  18 U.S.C. § 3553(a)(2)(B).  The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[25]  The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power.  As noted by Judge Moss, during sentencing in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy.  It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation."  *Id.* at 70.

---

[25]  *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. While Palmer did voluntarily surrender to law enforcement, it is worth noting that this did not occur until after he had been publicly identified, contacted by the media, and knew he would face criminal consequences. *See United States v. Matthew Mazzocco*, 21-cr-54 (TSC), Tr. 10/4/2021 at 29-30 ("[The Defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

Though Palmer's letter to the Court claims that he now realizes that he was lied to by the former President and others about a stolen election, there is good reason to be skeptical of such "eleventh hour" conversions. Palmer does not explain what caused this complete reversal in his worldview, nor does he identify any new information that was not available to him when he committed his crime. In light of Palmer's fundraising post and jail calls blaming the police for

his conduct on January 6, there is a significant likelihood that Palmer is simply telling the Court what he thinks it wants to hear, and that he would engage in violence in the future if fed similar lies to those which motivated him on January 6.

## E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita*, 551 U.S. at 349.   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"  *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108.   Accordingly, courts must give "respectful consideration to the Guidelines."  *Id.* at 101.   As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. § 1A1.1, intro, comment 3.   More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process.   See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines).   Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case.   Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005).   "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that

sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will – the same Congress that served as a backdrop to this criminal incursion – the Guidelines will be a powerful driver of consistency and fairness moving forward.

## F.    Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6) – the need to avoid unwarranted sentencing disparities – the crimes that Palmer and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other assaults on law enforcement in other cases. To try to mechanically compare other defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

As of the date of this sentencing memorandum, very few felony Capitol Riot defendants have been sentenced. In the first such case, *United States v. Paul Hodgkins*, 21-cr-188 (RDM), the defendant entered the Capitol and reached the floor of the Senate. Hodgkins took very early responsibility for his actions, and he did not commit violence on January 6. Hodgkins was

sentenced to 8 months incarceration, based on a sentencing range of 15-21 months.   More recently, in *United States v. Chansley*, 21-CR-3 (RCL), the so-called "QAnon Shaman" Chansley climbed a tower on the way into the Capitol, was one of the first rioters to enter the Capitol, challenged law enforcement officers who wanted them to leave, entered the Senate chamber and left a threatening note for the Vice President.   However, Chansley did not assault any law enforcement officers.   Based on a sentencing range of 41-51 months, Chansley was sentenced to 41 months imprisonment.

A more relevant comparator is *United States v. Fairlamb*, 21-cr-120 (RCL), in which the defendant was convicted of one count of 18 U.S.C §1512(c)(2) and one count of 18 U.S.C. § 111(a).   There, the government sought a 44-month sentence, and the Court imposed a 41-month sentence.   Fairlamb stormed the police line on the West Terrace, where he acquired, but never used, a police baton.   Fairlamb then entered the U.S. Capitol building, but almost immediately exited.   At one point, Fairlamb sought to assist law enforcement officers.   Approximately ten minutes later, Fairlamb encountered law enforcement officers attempting to keep rioters from entering the building through the Parliamentarian door.   Subsequently, still on the Terrace outside the Capitol, Fairlamb assaulted a member of law enforcement with his hands, striking him in his face shield.   Unlike Fairlamb, Palmer engaged in *repeated* assaults on law enforcement, acquired *and used* dangerous weapons, and never sought to assist law enforcement.   Though Fairlamb used the same fundraising site as Palmer, Fairlamb did not lie about his conduct or deny his culpability, so Fairlamb's sentencing range included a reduction for acceptance of responsibility.   For all of these reasons, Palmer's violation of 18 U.S.C. § 111(b) warrants a higher sentence, and a guideline sentence of 63 months would not create an unwarranted sentencing disparity.

## VI.    **RESTITUTION**

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[26]  *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).   Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).   At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement."  *See* 18 U.S.C. § 3663(a)(3).  *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.   Although Palmer engaged in assaultive conduct, that conduct fortunately did not result in bodily injury to any victim.   The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Palmer must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role he played in the riot on January 6.[27]   Plea Agreement at ¶ 12.   As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.*   Palmer's restitution payment must

---

[26] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[27] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 136.

## **CONCLUSION**

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 63 months, which is the low point of the Guidelines range as calculated by the U.S. Probation Office and as agreed upon by the parties in the plea agreement.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:    */s/  Robert Juman*
ROBERT JUMAN
Assistant United States Attorney
Bar No. NJ 033201993
United States Attorney's Office, Detailee
555 Fourth Street, N.W.
Washington, DC 20530
Phone: (786) 514-9990
E-mail: Robert.juman@usdoj.gov