UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,      .
                               .
          Plaintiff,           .   CR No. 21-0328 (TSC)
                               .
     v.                        .
                               .
ROBERT SCOTT PALMER,           .   Washington, D.C.
                               .   Friday, December 17, 2021
          Defendant.           .   12:36 p.m.
. . . . . . . . . . . . . . . . . .


TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

For the Government:          ROBERT C. JUMAN, AUSA
                             U.S. Attorney's Office
                             500 E. Broward Blvd.
                             Ft. Lauderdale, FL 33132
                             (786) 514-9990


For the Defendant:           BJORN E. BRUNVAND, ESQ.
                             Bjorn Brunvand, P.A.
                             615 Turner Street
                             Clearwater, FL 33756
                             (727) 446-7505


Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001
                             (202) 354-3186


Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

```
 1                    P R O C E E D I N G S
 2           THE DEPUTY CLERK:  Your Honor, calling criminal case
 3    No. 21-328, the United States of America versus Robert Scott
 4    Palmer.  This is an in-person proceeding.  Mr. Palmer is
 5    present and in the courtroom.  The probation officer present
 6    for these proceedings is Officer Robert Walters.  Counsel for
 7    the government is Mr. Robert Juman, and the counsel for the
 8    defendant is Mr. Bjorn Brunvand.
 9           THE COURT:  All right.
10       Mr. Palmer, good afternoon.  How are you doing?
11           THE DEFENDANT:  Pretty good, Judge.  Thank you.
12           THE COURT:  All right.  And, Mr. Brunvand, you
13    said Mr. Palmer has family members in the audience?
14           MR. BRUNVAND:  Yes, Your Honor.  Present in the
15    audience is his daughter, Shannon Palmer, and his son,
16    Robert Palmer.
17           THE COURT:  All right.  Before we get any further,
18    let he tell anyone who is calling in that it is strictly
19    prohibited by federal and local court rules to broadcast,
20    record any portion of this hearing.  And I don't have to
21    mention screenshots, because we are doing this in person.
22       Okay.  We are here for the sentencing of the defendant,
23    Robert Palmer, who has pleaded guilty to Count Three of the
24    indictment against him: Assaulting, Resisting, or Impeding
25    Certain Officers Using a Dangerous Weapon, in violation of
```

1    18 U.S.C. Sections 111(a) and (b).

2        In preparation for this hearing, I have received and

3    reviewed the following, the presentence report and the

4    sentencing recommendation from the Probation Office, and I've

5    also reviewed and received the following documents submitted

6    by counsel in advance of the hearing:

7        The plea agreement and statement of offense signed by

8    Mr. Palmer; sentencing memoranda from the government and

9    from Mr. Palmer including Mr. Palmer's motion for a downward

10   variance; a letter from Mr. Palmer and 18 letters of support

11   from family, friends, neighbors, and former customers; as

12   well as a forensic psychological evaluation of Mr. Palmer.

13   I've read all of these materials.

14       Is there anything else that I'm missing, Mr. Juman?

15            MR. JUMAN:  No, Your Honor.

16            THE COURT:  Mr. Brunvand.

17            MR. BRUNVAND:  Yes, Your Honor.  The only document

18   that I don't believe you mentioned that was attached to the

19   sentencing memo was the U.S. Marshal report detailing the

20   conditions of the local detention facility.

21            THE COURT:  Just a minute.  I think I did see that.

22   Hold on.  Is there a document number for that?

23            MR. BRUNVAND:  It's an Exhibit A or B to the sentencing

24   memo, Your Honor.

25            THE COURT:  To your sentencing memo?

1          MR. BRUNVAND:  Yes, Your Honor.

2          THE COURT:  Okay.  Hold on.  Then I must have seen it.

3     Oh, and I've also received a letter from Mr. Palmer, which

4     I've also had a chance to read.

5          THE DEPUTY CLERK:  31-1, Your Honor.

6          THE COURT:  I see it, yes.  Is that the memo regarding

7     the conditions at the jail?

8          MR. BRUNVAND:  That's correct.

9          THE COURT:  Yes.  I have previously seen that, and

10    I saw it when it was attached.

11         MR. BRUNVAND:  Yes, Your Honor.

12         THE COURT:  All right.  Other than that, anything

13    I'm missing?

14         MR. JUMAN:  No, Your Honor.

15         THE COURT:  Okay.  Good.

16       All right.  Let me begin first with the presentence report.

17    The final presentence report and sentencing recommendation

18    were filed on December 10, 2021.  Mr. Palmer has raised three

19    objections: (1) to the cover page, (2) to paragraphs 31, 32,

20    and 42, and (3) to paragraph 139.  I shall address these in

21    order.

22       The cover page -- I believe your objection to the cover

23    page is to the inclusion of Robert Feitel?

24         MR. BRUNVAND:  Yes, Your Honor.  It has no bearing

25    on the sentencing, but Mr. Feitel was kind enough to do a

1    pro hac vice motion when I first became involved in this case.

2    I then became a member of the bar.  He never filed a notice

3    of appearance.  And I know he gets copied on a regular basis,

4    but his sole involvement was to file the pro hac vice motion.

5            THE COURT:  Yeah.  The Probation Office's response

6    to that is Mr. Feitel is still listed as an attorney of record

7    on ECF, and it's their practice to include all attorneys of

8    record in the presentence report.

9            MR. BRUNVAND:  That's fine, Your Honor.

10           THE COURT:  It's not incorrect.  It's not factually

11   incorrect.  So I'm going to leave it, but obviously your

12   position is in the record.

13      Mr. Juman, do you have anything you want to add to that?

14           MR. JUMAN:  No, Your Honor.  We think it's fine to

15   keep it in there.

16           THE COURT:  Because this is a purely administrative

17   matter and Mr. Feitel is still listed as an attorney of record

18   for Mr. Palmer in the ECF, the contents of the presentence

19   report cover page will remain unaltered.

20      With regards to paragraphs 31, 32, and 42 with regard

21   to acceptance of responsibility, I believe that is the subject

22   of your motion for downward departure, and I will address

23   that.  At this point, I'm simply asking for objections to

24   the facts.

25           MR. BRUNVAND:  That's correct.  We're not disputing

1    the fact that the government and Probation relies on for

2    purposes of their position that acceptance of responsibility

3    should not be provided.

4         THE COURT:  Okay.  With regard to paragraph No. 139,

5    that's the conclusion of the Probation Office that it has not

6    identified any factors that would warrant a variance from the

7    applicable guideline range based on the factors outlined in

8    18 U.S.C. § 3553(a).  Again, that's not factual.  That goes to

9    what you're going to argue with regard to your motion for a

10   downward variance.

11        MR. BRUNVAND:  Yes, Your Honor.

12        THE COURT:  These are the subjects of the motion,

13   and I will address these later.

14     The Probation Office certainly is entitled to come to

15   whatever conclusion they come to, and their conclusion is

16   certainly supported by the facts in the record, and I will

17   not alter paragraph 139.  So I will adopt the paragraphs

18   as presented in the presentence report.

19     As you know, as I told you at your plea, I'm not bound

20   by the Probation Office's recommendation.  That is simply

21   their calculation for my benefit.

22     Mr. Juman, does the government have any further objections

23   not yet addressed to any of the factual determinations set

24   forth in the presentence report?

25        MR. JUMAN:  No, Your Honor.

1    THE COURT:  Mr. Brunvand?

2    MR. BRUNVAND:  No, Your Honor.  Thank you.

3    THE COURT:  All right.  I assume, Mr. Juman, that

4  you don't expect an evidentiary hearing?  You have no

5  witnesses present?

6    MR. JUMAN:  We do not have any witnesses present,

7  and we do not expect to need any.  We do have argument if

8  the Court will allow.

9    THE COURT:  Oh, yes.

10    Okay.  Mr. Brunvand, have you and Mr. Palmer read and

11  discussed the presentence report?

12    MR. BRUNVAND:  We have, Your Honor.

13    THE COURT:  And do you have any further disputed issues

14  of fact; that is, any further objection not yet mentioned to

15  any of the factual determinations set forth in the presentence

16  report?

17    MR. BRUNVAND:  No, Your Honor.

18    THE COURT:  Mr. Palmer, are you fully satisfied with

19  the services of Mr. Brunvand in this case?

20    THE DEFENDANT:  Yes, ma'am.

21    THE COURT:  You have to speak so that -- you may have

22  to share the microphone because -- there you go.

23    THE DEFENDANT:  Yes, ma'am, I am.

24    THE COURT:  All right.  Do you feel that you've had

25  enough time to talk with him about the presentence report and

1   the papers that were filed in this case?

2              THE DEFENDANT:  Yes, ma'am.

3              THE COURT:  All right.  Having addressed the defense

4   objections and hearing no further objection, I will accept

5   the factual recitation in the presentence report regarding

6   the circumstances of the offense, and therefore the facts as

7   stated in the presentence report will be my findings of fact

8   for the purpose of this sentencing.

9        Okay.  With regard to the guidelines, the presentence

10  report lays out the Probation Office's calculation of the

11  advisory guideline range that applies in this case.  This

12  calculation was done using the 2021 guidelines manual and

13  is as follows:

14       The applicable guideline for Count Three, Assaulting,

15  Resisting, or Impeding Certain Officers Using a Dangerous

16  Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b),

17  is §2A2.2(a), which has a base offense level of 14.

18       Because dangerous weapons, including a plank and a fire

19  extinguisher, were used in the commission of the charged

20  offense, the offense level is increased by four, for a new

21  total of 18 per §2A2.2(b)(2)(B).

22       Because Mr. Palmer was convicted under 18 U.S.C. § 111(b),

23  the offense level is increased by two points, for a new total

24  of 20 per §2A2.2(b)(7).

25       Because Mr. Palmer's conduct's victim was a government

officer or employee, and the offense of his conviction was
motivated by that status, the offense level is increased
by six, for a new total of 26 per §3A1.2(b).

As stated in the presentence report, and I know it's
challenged by Mr. Brunvand, the Probation Office has declined
to apply the two-level reduction contemplated by §3E1.1(a) for
acceptance of responsibility.

Therefore, prior to the consideration of any departures or
variances, the Probation Office calculates Mr. Palmer's total
offense level as 26.

Turning to the criminal history category, the presentence
investigation has found that Mr. Palmer, although he has
prior convictions, he has zero prior convictions that receive
criminal history points in the guidelines manual, therefore
giving him a criminal history point subtotal of zero and
putting him in criminal history category I.

Based on the offense level and the criminal history
category I've just discussed, the presentence report
calculates the guidelines sentencing range to be 63 months
to 78 months of imprisonment.

Now, having determined the applicable guidelines range,
let me consider departures and variances.  The presentence
report does not include any departure grounds.  In the plea
agreement, the government has reserved the right to request
an upward departure for the promotion of terrorism as set

1    forth in §3A1.4(a) but has not done so.  Mr. Palmer has

2    made a motion for a downward variance and has argued that

3    the two-level reduction of acceptance of responsibility,

4    per §3E1.1(a), should apply to his total offense.

5        I'm going to consider the two arguments separately.

6    One is with regard to the presentence report's calculation

7    not giving him the two-level reduction, and then I'll address

8    it again in your motion for a variance.  I think that makes

9    sense.

10       So Mr. Palmer objects to the Probation Office's determination

11   to recommend that a two-level downward adjustment in his total

12   offense level not be applied to his sentencing recommendation

13   as per U.S. Sentencing Guideline §3E1.1.

14       The Probation Office declined to apply this adjustment based

15   on an internet posting that was discovered after Mr. Palmer

16   pleaded guilty on October 4, 2021.  The posting titled "Help

17   Patriot Rob" was posted on fundraising website GiveSendGo and

18   solicited donations to help pay for Mr. Palmer's legal fees.

19   That posting included the following language:

20           January 6 would never be the same.  Hello, my

21           name is Robert.  I am a proud father of 4, a once

22           successful business owner, a Christian man, and a

23           proud American patriot who went to the Capitol on

24           January 6 to support our president and to witness

25           the overturn of the election.  While protesting

1          the election, I was shot at with rubber bullets

2          and sprayed with tear gas.  I didn't even go

3          through the barricade into the Capitol.  I did,

4          however, go on the defense and throw a fire

5          extinguisher at the police as I could not believe

6          they had just shot me.

7   And that is a portion of the posting I'm quoting from.

8   Obviously, it's not the entire thing.

9       Section 3E1.1 applies a two-level downward adjustment to

10  a total offense level when a defendant clearly demonstrates

11  acceptance of responsibility for their offense.

12      In determining such a clear demonstration, the Probation

13  Office relies on note 3 to the guideline, which indicates

14  that when a defendant pleads guilty, their truthful admission

15  that they committed the conduct in question constitutes

16  significant acceptance of responsibility.

17      Now, it is true that Mr. Palmer, in his plea of guilty,

18  agreed that the facts outlined and his behavior outlined

19  in the statement of offense is what he did.

20      The Probation Office contacted the government, after

21  discovering the fundraising post, to determine the veracity

22  of Mr. Palmer's claim that he threw the fire extinguisher at

23  police in self-defense.  Mr. Palmer's posting, it should be

24  noted, contradicted the statement of offense and contradicted

25  his admission under oath at his plea that he threw the fire

extinguisher before he was fired upon by the police with rubber bullets.  The Probation Office's exchange with the government revealed this characterization of Mr. Palmer's events on the fundraising website to be false.

Accordingly, the Probation Office determined that Mr. Palmer's guilty plea was not truthful and that the two-level downward adjustment -- either Mr. Palmer's guilty plea was not truthful, or Mr. Palmer's fundraising post was not truthful, actually, and that the two-level downward adjustment for acceptance of responsibility should not apply to Mr. Palmer's total offense level.

Mr. Palmer responds to this by contending that he may not have been aware -- and by the way, he responds to this through counsel -- that he may not have been aware of the degree to which the complete contents set forth in the post violated the §3E1.1 n.3 standard for truthful admission of conduct.

He states that the language was not a false denial of the events, but rather an inaccurate depiction of the time frame or motivation of the events as they occurred.  He concedes that he was not shot with rubber bullets until after he threw the fire extinguisher, but also notes that the air was filled with tear gas and pepper spray.  Mr. Palmer also notes that when defense counsel became aware of the post, he advised Mr. Palmer to take it down and to refund any monies raised to the respective donors.

1    He also notes his early acceptance of responsibility and

2    his admission of guilt by his plea as further evidence of a

3    truthful admission of guilt.  This issue is also the subject

4    of Mr. Palmer's motion for a downward adjustment, to be

5    addressed later.

6    Well, this raises some questions on my part.  First of all,

7    I've said it often; I don't know if I said it at your plea

8    hearing:  I don't want anyone pleading guilty if they're not

9    guilty.  I placed you under oath, Mr. Palmer, at your plea

10   hearing, and I asked you certain questions about your conduct

11   on January 6.

12   You agreed that the events stated in the statement of

13   offense, the facts stated in the statement of offense, were

14   correct.  You conceded and admitted that you threw the fire

15   extinguisher and other projectiles at law enforcement before

16   you were fired upon with rubber bullets.

17            MR. JUMAN:  Your Honor, I apologize for interrupting.

18   Can I address one issue?

19            THE COURT:  Yes.

20            MR. JUMAN:  Your Honor, at the time we negotiated a

21   plea agreement with the defense, we did not know that the

22   defendant was going to take this position as to the sequence

23   of his being shot --

24            THE COURT:  I'm sure you didn't.

25            MR. JUMAN:  And we didn't mention him being shot in

1    the statement of offense.  So, technically, his statement

2    of offense at the time of his plea made no reference to the

3    attack.  I think it is certainly inferential that there was

4    no reference to it as being in self-defense, but I just wanted

5    it to be clear --

6              THE COURT:  Thank you.

7              MR. JUMAN:  -- that he didn't actually say he did

8    one before the other.

9              THE COURT:  Right.  And which is the only reason why

10   he's not actually looking at the possibility of prosecution

11   for a false statement.

12             MR. JUMAN:  Fair enough, Your Honor.

13             THE COURT:  Thank you for pointing that out.  The

14   being fired on by the rubber bullets was not -- there was

15   no sequence listed in the statement of offense.

16      But I believe you did not raise a defense of self-defense.

17   Isn't that right, Mr. Brunvand?

18             MR. BRUNVAND:  That's correct, Your Honor.

19             THE COURT:  So I have to ask you, and I have to make

20   sure of that before I proceed to sentencing: Does Mr. Palmer

21   raise an issue of self-defense at this point?

22             MR. BRUNVAND:  Your Honor, he does not.  He did not

23   when we first met with law enforcement back in March of 2021.

24   The statement that was made on the fundraising website was

25   false.  I believe he will acknowledge that it was false

1    and that he's sorry that he in fact did that.  And I can

2    elaborate --

3           THE COURT:  Well, I'm going to inquire of your client.

4       Mr. Palmer, can you pull the microphone to you?  Make sure

5    you speak loud and clear into it.

6       Mr. Palmer, you pleaded guilty in October to assaulting

7    police officers with a dangerous weapon.  Is that still your

8    plea?

9           THE DEFENDANT:  Yes, ma'am, it is.

10          THE COURT:  Now, after your plea, you posted statements

11   on a fundraising website, stating that you were shot with rubber

12   bullets by the police before you threw the fire extinguisher

13   at them.  Is that what you posted?

14          THE DEFENDANT:  Yes, ma'am.

15          THE COURT:  Were those statements true, or were

16   they false?

17          THE DEFENDANT:  No, they were false.

18          THE COURT:  When you threw the fire extinguisher

19   and the plank at the police officers, were you acting in

20   self-defense?

21          THE DEFENDANT:  No, ma'am, I was not.

22          THE COURT:  Mr. Juman, are you satisfied?

23          MR. JUMAN:  Your Honor, I think that is consistent

24   with our understanding of the facts.

25          THE COURT:  Thank you.  But I have to satisfy

1    myself that Mr. Palmer does not have any kind of claim of

2    self-defense, that he understands fully, and there's no factual

3    basis for a claim of self-defense before I accept his plea.

4         MR. JUMAN:  I think that's correct, Your Honor.

5    I don't think this is anything that interferes with the

6    validity of the defendant's plea.

7         THE COURT:  Mr. Brunvand?

8         MR. BRUNVAND:  I agree, Your Honor.  Mr. Palmer's

9    tried to get my attention.  Am I allowed to go around --

10        THE COURT:  At any time.  Mr. Palmer, we're not

11   going to rush through this.  If you need to consult with

12   your lawyer, just consult with him.  Do you need five minutes?

13   Do you want me to take a recess?

14        THE DEFENDANT:  Yes, ma'am.

15        THE COURT:  All right.  I'll be back.

16      (Recess from 12:56 p.m. to 1:01 p.m.)

17        THE COURT:  All right.  Mr. Palmer, have you had

18   enough time to talk with your lawyer?

19        THE DEFENDANT:  Yes, ma'am.  Thank you.

20        THE COURT:  Okay.  Let's proceed.

21      And by the way, I'm looking at the statement of offense,

22   and, Mr. Juman, thank you for that correction.  It does not,

23   in fact, mention that Mr. Palmer was shot with rubber bullets

24   before or after he assaulted the police.

25      All right.  With regard to the Probation Office's

calculation, in concluding its report, the Probation Office
indicates that it has not identified any factors that would
warrant a variance from the applicable guideline range based
on the factors outlined in 18 U.S.C. § 3553(a), and Mr. Palmer
objects, noting that he has presented reasons meriting a
downward variance.

I agree with the Probation Office's calculation -- and
so does the government, I would note -- that the Probation
Office finds that Mr. Palmer's posting of the concededly false
statements regarding the facts of his offense indicate that, at
least at a time after he pleaded guilty, he was still denying
his culpability in the offense, and therefore those statements
provide a basis on which to deny Mr. Palmer the two-level
reduction.

I agree with the Probation Office's calculation of that
denial of the two-level reduction, and therefore their
calculation of the appropriate range will be my finding for
purposes of this sentencing.  So I do agree with the Probation
Office's calculation of Mr. Palmer's total offense level at
26, and I do agree that with a criminal history category of I,
Mr. Palmer's appropriate sentencing range is 63 months to 78
months of imprisonment.

The government is asking for a sentence at the low end
of that range, and Mr. Brunvand has moved for a variance, a
downward variance, which I will then subsequently address.

In fact, I'll address it now.

In support of his motion for a two-level reduction and a variance in the sentencing range, Mr. Palmer offers that he was one of the first defendants to plead guilty among defendants charged with felony offenses, that he promptly turned himself in to law enforcement when he learned that he was under investigation and admitted his role in the offense after the arrest.  He states that the decision to post on the fundraising website was a result of the stress of his incarceration and that he immediately returned all donations once he realized his mistake in posting.

In support of the downward variance, Mr. Palmer further refers to the sentencing factors outlined in 18 USC § 3553(a).  Specifically, Mr. Palmer asserts that he was motivated to go to the Capitol at the behest of the former president, who had convinced him that the 2020 presidential election was stolen and that his presence was needed at the Capitol to stop the presidential transition.

Mr. Palmer argues that his presence at the Capitol on January 6 was the result of his desire to act patriotically and for the good of the nation; this mindset and the, quote, "crowd mob effect" caused him to assault the Capitol Police that day.  He also offers that while he accepts and regrets his actions, it is relevant to consider that any purported architects of the January 6 riots have not been charged with

1   any criminal offense and that it would be an imbalance to

2   sentence him to an extended prison term while those actors

3   remain free.

4      With regard to Mr. Palmer's history and characteristics and

5   the need to protect the public, Mr. Palmer details the extremely

6   difficult upbringing that he had, as well as the regular physical

7   and mental abuse he suffered as a child at the hands of his

8   stepmother and other relatives, and these traumas manifested

9   as mental-health and substance-abuse issues as an adult.

10  Mr. Palmer offers that while these issues do not excuse his

11  actions, they contextualize why he believed his presence and

12  actions were necessary and patriotic at the time.

13     Mr. Palmer argues that the objects that he used -- a fire

14  extinguisher, a piece of wood, and a pole -- should not qualify

15  -- I'm going to ask you, Mr. Palmer, not to communicate with

16  members of the audience.  This is your sentencing.

17          THE DEFENDANT:  Sorry, Your Honor.

18          THE COURT:  You should focus on what's happening in

19  court up here.

20          THE DEFENDANT:  Yes, ma'am.  Sorry.

21          THE COURT:  And any attempt to communicate with

22  Mr. Palmer while the Court is going through the sentencing

23  proceeding could result from your being removed from the

24  courtroom.

25     Mr. Palmer argues that the objects he used -- a fire

1    extinguisher, a piece of wood, and a pole -- should not

2    qualify as weapons as they are not equivalent to knives or

3    firearms.  And with regard to the need to avoid sentencing

4    disparities, Mr. Palmer notes that any sentence within the

5    guidelines range would be higher than any other defendants

6    as yet sentenced in connection with the Capitol riots.

7        Mr. Brunvand, have I adequately summarized your position

8    in your motion for downward departure?

9            MR. BRUNVAND:  You have, Your Honor.

10            THE COURT:  I've reviewed the government's opposition.

11    Now I'm going to deny the motion for a downward departure.

12    I find that despite the factors outlined in Mr. Palmer's

13    motion, the two-level reduction and a downward variance is

14    given -- the two-level reduction is given for acceptance

15    of responsibility.  I've already said why I am not giving

16    the two-level reduction, and I find that the factors in

17    Mr. Palmer's motion for a variance do not warrant a variance

18    in this case.

19        Mr. Palmer, it is true, has -- and I'll go into this

20    further when I consider the 3553(a) factors -- has endured

21    a difficult childhood, but he overcame those difficulties,

22    and it is to his credit.  His early criminal history

23    notwithstanding, he built a business.  He has, by all

24    accounts, been a good father, a good friend, a good neighbor.

25        Therefore, the difficulties that he experienced in his

1    upbringing weren't the cause of why he went to the Capitol.

2    They may have been the cause of why he got those convictions

3    as a younger person, but he seems to have overcome all of

4    those problems, or at least to have dealt with them, and was

5    living an otherwise productive life.

6        He went to the Capitol because, despite election results

7    which were clear-cut, despite the fact that multiple court

8    challenges all over the country had rejected every single one

9    of the challenges to the election, Mr. Palmer didn't like the

10    result.  He didn't like the result, and he didn't want the

11    transition of power to take place because his guy lost.

12        And it is true, Mr. Palmer -- you have made a very good

13    point, one that has been made before -- that the people who

14    exhorted you and encouraged you and rallied you to go and

15    take action and to fight have not been charged.

16        That is not this court's position.  I don't charge

17    anybody.  I don't negotiate plea offers.  I don't make

18    charging decisions.  I sentence people who have pleaded

19    guilty or have been convicted.

20        The issue of who has or has not been charged is not before

21    me.  I don't have any influence on that.  I have my opinions,

22    but they are not relevant.  And you're correct in that no one

23    who was encouraging everybody to take the Capitol has been

24    charged as of yet, but I don't think that fact means that you

25    should get a lower sentence.

1    The fact is that there are lots of people who agreed with

2    you, who didn't like the results of the election, who perhaps

3    thought the election was stolen in some way.  They stayed

4    home.  You decided, of your own free will, to leave Florida

5    and come to Washington and go to the rally.

6        That's your right.  You're not being sentenced for your

7    political views.  When you left that rally and went to the

8    Capitol and saw what was going on and engaged in combat with

9    those law enforcement officers, that's what you're being

10   punished for.  So you have a point, that the people who may

11   be the people who planned this and funded it and encouraged

12   it haven't been charged, but that's not a reason for you to

13   get a lower sentence.

14       With regard to your argument that there's a need to

15   avoid sentencing disparity, I will address that issue when

16   I go through the 3553(a) factors in detail.  Which is now.

17       Section 3553(a) requires me to consider a variety of

18   factors including the sentencing range that the guidelines

19   prescribe, which I've just discussed, and the applicable penal

20   statutes.  The charge of Assaulting, Resisting, or Impeding

21   Certain Officers Using a Dangerous Weapon, in violation of 18

22   U.S.C. §§ 111(a)(1) and (b), is a Class C felony that carries

23   a maximum term of 20 years of imprisonment.

24       The statute provides that Mr. Palmer is eligible for

25   one to five years of probation.  Under the guidelines,

1    Mr. Palmer is not eligible for probation.

2         The statutes provide that Mr. Palmer faces a supervised

3    release range following imprisonment of not more than three

4    years per 18 U.S.C. § 3583(b)(2).  Under the guidelines, the

5    supervised release range is one to three years.

6         The statute sets a maximum fine of up to $250,000, and

7    the guidelines range is $2,000.  A special assessment of

8    $100 per count is mandatory.

9         The statutory and guidelines restitution provisions

10   are applicable because there is an identified victim, and

11   the restitution, per 18 U.S.C. § 3663(a), would be $2,000,

12   which is what I believe Mr. Palmer has agreed to pay as

13   restitution as part of his plea agreement.

14        Is that correct, Mr. Juman?

15             MR. JUMAN:  Yes, Your Honor.

16             THE COURT:  All right.  Mr. Juman, have I accurately

17   stated the statutory and guidelines framework under which

18   we're operating?

19             MR. JUMAN:  Yes, Your Honor.

20             THE COURT:  Mr. Brunvand?

21             MR. BRUNVAND:  Yes, Your Honor.

22             THE COURT:  All right.  Before I discuss the other

23   sentencing factors that will bear on my final decision, I

24   will at this point notify the parties -- you may already

25   know this -- of the particular sentence the Probation Office

1    has recommended.  The Probation Office, taking into account

2    the guidelines range and the available sentences and all of

3    the factors in § 3553(a), the Probation Office has recommended

4    63 months of imprisonment, 36 months of supervised release,

5    and $2,000 in restitution.

6        Again, as I have noted to you, Mr. Palmer, that is a

7    recommendation.  It is not binding on me.  I'm always guided

8    by the Probation Office's recommendation, but I don't always

9    go along with their recommendation.  I probably deviate with

10   it more than I go along with it, but it guides my decision.

11   The recommendation of the Probation Office is not based on

12   any facts or circumstances that have not already been revealed

13   to the parties in the presentence report.

14       At this point, I am going to give the parties the

15   opportunity to address the Court.  Mr. Juman?

16       MR. JUMAN:  Thank you, Your Honor.  In light of Your

17   Honor's rulings on the guideline range and the denial of the

18   defendant's motion for downward departure, I don't think I

19   have anything to add, unless the Court has any questions to

20   what's in our sentencing memo, just to say that we agree with

21   the recommendation of Probation.

22       THE COURT:  Well, thank you, Mr. Juman.  I have no

23   questions.  I think your sentencing memorandum was thorough

24   and set forth the facts and circumstances and the government's

25   position very well.

1        All right.  Mr. Brunvand.

2            MR. BRUNVAND:  Yes, Your Honor.  My client's son

3    is present and wanted to make a brief statement, if he may,

4    before I --

5            THE COURT:  It has to be brief, but yes.  You may

6    approach, state your name for the record, and speak into the

7    microphone.  State your name for the record.

8            MR. PALMER:  Hi, everyone.  I am Robert Scott Palmer, Jr.

9            THE COURT:  Good afternoon.

10           MR. PALMER:  Hello.  I will speak very briefly.

11   I appreciate the Court giving me this opportunity to speak.

12   This is not easy for me, as you can imagine.  I'm just here

13   to represent my father's character.  I do not in any way

14   condone the actions that took place.  I'm also saddened to

15   hear about the fundraising account in October.  I've had

16   minimal to no contact with my father since he's been

17   incarcerated.  I understand the inconsistencies are a factor.

18       I would just like the Court to keep in mind the pretrial

19   history where he had the zero to one point.  That is a reflection

20   of his character throughout that entire time of his life, and

21   I would just hope that the Court understands that the brief

22   instant in time, while it is severe and unacceptable, is just

23   a brief moment in comparison to a long, productive life.

24       And I would just ask that the Court, going forward, give

25   him every opportunity to prove his contrition and accept the

1   consequences for what he did.  Thank you.

2        THE COURT:  Thank you, Mr. Palmer.

3     Mr. Brunvand?

4        MR. BRUNVAND:  Yes, Your Honor.  I believe Mr. Palmer

5   would like to make a brief statement.

6        THE COURT:  He can.  I've read his letter, and he

7   can.  But what I usually do is I hear allocution from the

8   government, from counsel, and then the defendant.  I mean

9   I can change that up if there's a particular reason for it,

10  but usually I let the defendant hear what the lawyer says,

11  and then he can...

12       MR. BRUNVAND:  The only reason I'm asking him to be

13  able to go first is he's very concerned about -- he's very

14  nervous, and I know what he wanted to say to the Court, and

15  if he misses something, I can then --

16       THE COURT:  All right.  That's fine.

17     And it's normal to be nervous, Mr. Palmer.  Take your time.

18  Take a deep breath.

19       THE DEFENDANT:  Your Honor, I'm really, really ashamed

20  of what I did.  Excuse me.

21     (Pause)

22       THE COURT:  Take your time.

23       THE DEFENDANT:  You know, I had this long speech --

24  not speech, but this long thing I was going to say to the

25  Court, you know, but the thing that really changed my mind

1     about what I was going to say is, in jail we've got this thing

2     called the Education Tablet that you can log on and you can do

3     -- get your GED and learn different things.  You know.

4     They've got law libraries.  It's a very useful tool.

5          I'd logged on, and I saw a clip from MSNBC, Rachel Maddow,

6     and it was featuring my case.

7          THE COURT:  Do you -- I don't believe you used to watch

8     MSNBC before you got incarcerated.

9          (Laughter.)

10          THE DEFENDANT:  No, ma'am, I did not.  Honestly.

11     But, ma'am, I was horrified, absolutely devastated to see

12     myself on there.  Just to see the coldness and the calculation

13     going up to the steps with the fire extinguisher and spraying

14     it at those office.

15     I mean, ma'am, I have to tell you, my memory is just not

16     what it should be sometimes, and when I saw that, it just

17     brought back what actually happened.  And those officers were

18     just so brave just standing there, just taking all the stuff

19     that people were giving them, all the taunts, all the jeers,

20     everything, and I'm just so ashamed that I was part of that.

21     Very, very ashamed.

22     And, you know, as far as the GiveSendGo, I'm not going

23     to make any excuses, ma'am.  I'm not going to.  It was a lie.

24     It should've never happened.  I'm just very, very sorry.

25          And whatever sentence I get, you know, when I get out

1    there some day, I am going to be the kind of person that I

2    was before, and I will never, ever go to another political

3    rally again.  And I just want my family to know that I love

4    them.

5         And I'm so thankful for Mr. Brunvand.  He's done so much

6    for me.  He has been an awesome lawyer.  Ma'am, he even had me

7    out to his house when we did the PSI because he had a medical

8    procedure the next day, and his wife couldn't have been any

9    nicer.  They just welcomed me into their home, and it was just

10   so sweet, you know.

11        And, Mr. Juman, I know you're doing your job, and I respect

12   what you're doing for the United States, and the people are

13   really well served having you do that.

14        And I just thank you, ma'am, for taking the time and

15   listening to me, and I know that you're going to be fair

16   and you're going to do what's right, and I thank you for that.

17             THE COURT:  Thank you, Mr. Palmer.  I'm going to try.

18   That's all I can to.  Mr. Brunvand?

19             MR. BRUNVAND:  Yes, Your Honor.

20        Your Honor, I have a bunch of notes, but thank you for

21   giving me the opportunity to speak on behalf of my client.

22   You indicated that you recognized that he had a very difficult

23   childhood.  In reviewing and reading the presentence report,

24   we read about him being referred to as "a little f'er" by

25   the person who's supposed to provide for him, care for him,

provide him security and safety.  There were lots of other
examples that shouldn't happen to children as they grow up.

And I agree, Your Honor, that certainly the fact that he
was able to overcome that and have a productive life for quite
some time in many ways suggests that he was able to overcome
it.  As human beings, some of us are stronger than others.

I will suggest, however, respectfully, that it's always
there.  Even if you succeed in life, even if you are able to
have a productive life, the absence of love, the absence of
care, the absence of safety as a child is always there, and
the way we survive and the way we deal with these issues is --
unfortunately, one of the ways is self-deception and deception
of others.  Another way is unnecessary anger.

And, Your Honor, I would respectfully suggest that at the
Capitol on January 6 and what we witnessed Mr. Palmer do on
that particular day is a reflection of an issue that he has
that deals with anger, and I would suggest that it does relate
back to his childhood.  And I would suggest that, as part of
his supervision, when he is released from the period
of incarceration that Your Honor's going to impose, that it
should include mental health evaluation, and it should
include mental health treatment and counseling.

Mr. Palmer's case came to the forefront of the news when
Huffington Post did an article back in -- I believe it was
March 5th of this year.  I was contacted shortly thereafter,

1    and Mr. Palmer immediately told me he was guilty; he wanted

2    to plead guilty; he wanted to do what he could to try to make

3    right for what he had done.  I reached out to the government

4    spoke with the AUSA at a very early stage.  We met with agents

5    of the United States at the early stages.

6       Mr. Palmer was out of custody.  He was released on

7    supervised release up until his plea hearing on October 4,

8    and as part of the plea agreement we agreed that he needed

9    to be taken into custody and detained at that point.

10      The early days of his being in custody, a couple of things

11   took place that, unfortunately, again because of bad judgment

12   on Mr. Palmer's part, he had decided that it was a good idea

13   to go off his medication for depression and anxiety.  His

14   reasoning and what he suggested to me after the fact was it

15   would keep him from going to the psychiatric part of the jail.

16      While incarcerated in the initial part of the local jail,

17   where I guess people are generally housed when they first are

18   detained, which is the part that the Marshals Service talks

19   about --

20           THE COURT:  Central Detention Facility.

21           MR. BRUNVAND:  Yes, Your Honor.  He was having a very

22   difficult time.  He was not on his meds.  There was a moment

23   when he was coming back from having made a phone call, within

24   a few days of being there, where he had the unfortunate experience

25   of having feces and urine thrown at him.  I explained to him

1    that many, many, many decades ago, when I start started as a

2    public defender, unfortunately, these things sometimes happen

3    in jails.

4           THE COURT:  They shouldn't, but they do.

5           MR. BRUNVAND:  They shouldn't, but they do.

6    They shouldn't, but they do.

7      It is my belief, Your Honor, that the fact that he was not

8    taking his medication, the fact that the conditions were not

9    in any way ideal -- and they're much better where he is now.

10   He's indicated to me that in the medical facility where he is

11   now that --

12          THE COURT:  Correctional Treatment Facility?  CTF?

13          MR. BRUNVAND:  Yes.

14          THE COURT:  Yeah.  It is better there.

15          MR. BRUNVAND:  And he has figured out that you can get

16   by without getting in trouble, without having any issues in

17   that particular location.

18     But I believe that that contributed to his bad judgment

19   in doing what he did as far as the fundraiser.  You know, when

20   -- as the Court already knows, he immediately removed the one

21   when I told him to remove it and apologized.  Those actions

22   led to him basically -- led to both myself and the government

23   listening to a bunch of phone calls which made it very clear

24   that he certainly was part of authorizing the particular post.

25     There were also statements that were made by Mr. Palmer

during those phone calls that were derogatory towards myself. And throughout my representation of Mr. Palmer, from time to time I would receive random text messages from him where he would express his appreciation for not only my representation, but treating him as a fellow human being and as a friend.

And as recently as a few days ago, when I met with him via video, he said, you know, there's only four years' age difference between the two of us, but I kind of view you as a father figure.  And I appreciate that, and I'm glad that I can contribute to him; and I hope that when he's done serving his sentence that he will be able to have a productive life and not reoffend, and I believe he will.  I choose to believe that the derogatory comments is not a reflection of what he really means and who he really is.

Your Honor, I was going to go through --  and I'm going to shorten it up.  I don't want to take up too much time. But in preparation for today, I did go and I looked at how many arrests there have been for 111(a) and 111(a) and (b) cases up through this past Sunday, and by my calculations there's been 141 arrests and either indictments or pleas to information.

THE COURT:  They're still coming.  I've got one right after this.  They're still coming.

MR. BRUNVAND:  Still coming.  I know, Your Honor. I know, Your Honor.  I mention it because Mr. Palmer, through

1    his own doing, has lost acceptance, but he was the second

2    person of all these individuals to enter a guilty plea to

3    111(b).  He's the first person to be sentenced for 111(b).

4    The people that are charge with 111(a), which is basically

5    a battery or assault of a law enforcement officer, generally

6    are scoring at 24 to 30 months.  And it is what it is.

7    The guidelines are what they are.  I understand they're

8    discretionary.

9        Your Honor, I'm asking this court to consider all of that

10    and to impose what the Court believes is a just sentence, a

11    sentence that is sufficient for purposes of punishment but

12    not greater than necessary.  I'm also asking that you recommend,

13    if you're willing to do so, that he be placed in a Bureau of

14    Prisons facility in Florida.

15            THE COURT:  I was going to ask you.  Okay.

16            MR. BRUNVAND:  Yes.  And also, while he's worked on

17    flooring all his life, he has asked for a recommendation

18    that maybe he can get some training in the field of being

19    an electrician, and he's also asking that the Court recommend

20    the intensive drug treatment program and also mental health

21    treatment and evaluation while in the Bureau of Prisons.

22        And, Your Honor, could I just have one moment to check

23    with my client?

24            THE COURT:  Yes.

25        (Counsel conferring with Defendant.)

1          MR. BRUNVAND:  I just wanted to make sure about

2     the recommendation for RDAP, the intensive program that

3     I requested.

4          THE COURT:  Yes.

5          MR. BRUNVAND:  I appreciate your time and attention,

6     Your Honor, and I know these are extraordinary cases.  It's a

7     very sad chapter in our history.  My client can't take back

8     what he's done, but I still think he's a good man.  He's loved

9     by his daughter, his son, and I believe that he'll be able to

10    rejoin society -- one of the things that gave me great joy

11    yesterday, and it may seem like a little thing, but it gave me

12    great joy, and that is that he has been resistant to taking

13    the COVID vaccine, which, quite frankly, seems to be something

14    that he shares with a lot of people that were present --

15          THE COURT:  Every single defendant who's appeared in

16    front of me.

17          MR. BRUNVAND:  Yes.  So three days ago, when I talked

18    to him about it, I said to him, you know, are you a doctor?

19    And he said no.  And I said, well, then get over it.  Take the

20    test.  Get the vaccine.  Move on.  And when I showed up to see

21    him at the jail yesterday, he was late coming out, and I was

22    informed by the guards that the reason he was late coming out

23    was because he was getting his first shot of the COVID vaccine.

24          THE COURT:  I am so very glad to hear that.

25    And people are entitled to their beliefs and their actions,

1   and I don't punish you -- I'm not punishing anybody for who

2   they support.  You could support the Flying Spaghetti Monster,

3   or whatever your political beliefs are, or whether you want to

4   vaccinate yourself or not.  But your actions demonstrate to me

5   in doing that that you are capable of reflection and listening

6   and changing your mind based on the information that you

7   receive, and also that I hope you're motivated not only by

8   your own personal medical safety but the safety of your fellow

9   members of your community.  So I'm very happy to hear that.

10          MR. BRUNVAND:  Thank you, Your Honor.

11          THE COURT:  All right.  Thank you all.  Everybody

12   has worked very hard in this case, and I'm going to start

13   by mentioning, Mr. Palmer -- and I'm hopeful.  You tell me

14   you're watching MSNBC.  A steady diet of any one of these

15   cable shows is probably not a good idea for anybody, but some

16   of my colleagues have said to defendants, listen to some other

17   sources of information.

18      And I feel certain that if people would expose themselves

19   to a variety of opinions and sources of information, we might

20   not have had January 6th.  But people get very siloed and

21   listen to an echo chamber of information and opinion, and you

22   get a very warped view of what's really going on in the world;

23   and that may be part of it, but in doing so, you fail to see

24   other people as human beings.  And that is one of the things

25   I see here as a judge, is there is a failure to acknowledge

1    other people's humanity.

2        You have seen firsthand now how horrible the conditions

3    in the jail are.  You've attached the report from the Marshals,

4    who have been very brave and courageous in documenting and

5    trying to correct those conditions.  The jail is a horrible

6    place.  I was a public defender for a long time, and I spent

7    a lot of time in jail visiting clients; and every time I left,

8    I was so happy to get out of there.

9        But I would wager that you and many of your colleagues

10   and friends probably think that jail is for other people,

11   and if conditions are bad in the jail, then the people somehow

12   deserve them.  And you've had a chance firsthand to see that

13   that position fails to take into consideration the humanity of

14   other people.

15       I have, on a regular basis, young men and young women,

16   some older, before me who had horrible childhoods, whose

17   parents were abusive, whose parents were in jail, whose

18   parents had drug problems, and it's not surprising to anyone

19   that they end up in front of me eventually.  But many people

20   who are not acquainted with the criminal justice system don't

21   see the humanity in those people.  Your lawyer, as a defense

22   lawyer, probably has experience in this as well.

23       And so I am happy that there are people and there are

24   articles talking about the conditions in the jail.  I am

25   perhaps a little cynical about why those conditions are

1    receiving such publicity now that there are defendants in

2    the jail who probably have access to political influence that

3    your average jail resident does not.  But in any event, I'm

4    glad that attention is being paid.

5        The other thing I wanted to mention to you is what your

6    lawyer talked about, which is none of us are the worst thing

7    we've ever done, and you have made some mistakes in your life.

8    You've committed some crimes early in your life.

9        You got yourself together.  You straightened up.  The fact

10   that you have children here willing to come and speak on your

11   behalf, who love and support you, is a testament to who you

12   are.

13       I don't know if your remorse now genuine or not.  I

14   certainly hope it is.  It sounds like it is.  Your actions

15   after your plea do undercut that argument, but again you've

16   had some time.  But I hope it is true.  I hope your remorse is

17   true.  I hope your remorse is genuine, and I hope you continue

18   to consider other sources of information as you go forward.

19       After calculating the sentencing guidelines and departures,

20   and hearing the statements made by counsel and by Mr. Palmer,

21   I have to now consider the relevant factors set out by

22   Congress in 18 U.S.C. § 3553(a) and ensure that I impose a

23   sentence sufficient but not greater than necessary to comply

24   with the purposes of sentencing.

25       These purposes include the need for the sentence to reflect

the seriousness of the offense, to promote respect for the law, and to provide for just punishment.  It should also deter criminal conduct, protect the public from future crimes by the defendant, and promote rehabilitation.

I also have to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the types of sentences available, the need to avoid unwarranted sentence disparity, and the need to provide restitution.  I've considered all of these factors at some length, and I'll set forth my thinking on some of them now.

With regard to the nature of the offense, at the risk of sounding like a broken record, the events of January 6 were unprecedented in this nation's history.  It was not a peaceful protest; it wasn't a loud protest.  It was a violent attempt to stop the peaceful transition of power.  It was a violent attempt to overthrow a duly and lawfully elected government.

It resulted in destruction, death, injury - injuries both visible on that day and injuries which many people who were inside the Capitol will carry with them for a very long time.  We've had police officers commit suicide since the events of that day.

Mr. Palmer traveled to Washington by plane from his home in Florida.  He attended the rally, and then he made his way to the Capitol bedecked in political regalia: Florida for Trump hat and Florida flag jacket.  At approximately 4 p.m.,

1    Mr. Palmer was on the Upper West Terrace, leaning over the

2    railing, holding a sign stating "Biden is a Pedophile."

3    From his vantage point, Mr. Palmer had an excellent view

4    of the rioters who were attacking police officers who were

5    vastly outnumbered, attacking them with pepper spray, metal

6    rods, and stolen riot shields, among other things, along with

7    group chants of "Pull the cops out" and "Drag them out."

8    Along with other rioters, Mr. Palmer cheered on the violent

9    attacks of the police, at one point raising his arm up in

10   the air in support as rioters shoved a large flagpole into

11   the tunnel where law enforcement officers were trying to keep

12   occupants of the Capitol safe, occupants including the vice

13   president and his family.

14   Palmer watched these events happen before he joined in.

15   These rioters were also busy erecting scaffolding, gallows,

16   on the grounds of the Capitol.  Mr. Palmer made his way to

17   the front line of the rioters and proceeded to attack the

18   officers.  He first threw a wooden plank at officers.  Then

19   he sprayed the contents of a fire extinguisher at officers,

20   and when that was empty, he hurled it at the police.

21   He then turned around for additional materials with which

22   he could assault the police, including throwing the fire

23   extinguisher a second time.  At this time, after the assault,

24   after he had assaulted the police, he was pepper-sprayed by

25   law enforcement.  The pepper spray only deterred him for a

1          short time.

2              A few minutes later, on the West Plaza, Mr. Palmer

3          assaulted another group of law enforcement officers with a

4          four- to five-foot pole.  As he threw the pole like a spear

5          at the officers.  One of them fired a nonlethal projectile,

6          a rubber bullet, which hit him in the abdomen.

7              He retreated and lay on the ground for a few minutes,

8          and when he got up, he showed his injury off to this crowd,

9          lying to them that he had been shot merely for yelling at

10          the police when in fact he had provoked the injury by his

11          own assault.  I've viewed the videotape of that.

12              Thereafter, in statements to a reporter, Mr. Palmer

13          admitted that his goal that day was to subvert a democratic

14          election and that he hoped for military intervention to

15          overturn the election in order to keep the losing candidate

16          in power.

17              I've already gone through Mr. Palmer's false postings

18          after his guilty plea, falsely stating that his assaults

19          on law enforcement were a reaction to, rather than the cause

20          of, his being tear-gassed and shot with rubber bullets.

21              Despite being outnumbered that day, law enforcement

22          officers labored valiantly and tirelessly to protect the

23          Capitol and its occupants from the violent, out-of-control

24          mob -- a mob that erected, as I said, scaffolding outside and

25          indicated their desire to kill the vice president who was

1    supposed to preside over the certification of the election

2    results.

3        Those police officers who were there at the Capitol and

4    who came to the Capitol -- some MPD police officers were doing

5    their regular work in the city, heard the call for help,

6    stopped what they were doing, came to the Capitol, where

7    they almost were killed.  They were the patriots that day,

8    Mr. Palmer.

9        Look behind you.  See that gentleman and that lady right

10   there?  They're U.S. Marshals.  That day, U.S. Marshals ran

11   from this courthouse to the Capitol.  They put themselves in

12   danger to protect the occupants of that Capitol.  That's what

13   they're sworn to do.  Everybody else was running away, trying

14   to get away from the violence.  They run towards it, because

15   that's what they're sworn to do.  That's their job.

16       They're the patriots.  They don't consider their safety;

17   they consider the safety of the people they're designed to

18   protect, which include people in that Capitol, and which

19   includes me.  They're the patriots.  And some of them did

20   not know if they were going to see their children again that

21   night.

22       The people who were inside that Capitol, the men and

23   women working for Congress, the senators, congressmen, they

24   are patriots.  They were there doing what the people elected

25   them to do, doing what this government pays them to do despite

1       the conditions, and they didn't know if they were going to
2       see their families again that night.  They didn't know if
3       they were going to come out alive that night.  They are the
4       patriots.
5           People outside of this city love to point at Washington
6       as a problem, love to somehow imply that this is a swamp, that
7       we're all here wasting the taxpayers' money.  Well, let me
8       tell you, the men and women who kept democracy functioning that
9       day and saved lives, they deserve the thanks of this nation.
10      They didn't deserve to have a fire extinguisher thrown at
11      them.  They didn't deserve to be called names, to be spat on.
12          And I wonder, Mr. Palmer, whether if some of the people
13      that I see before me on a regular basis in this courtroom,
14      charged with drug offenses and other offenses that are usually
15      the subject of federal charges, if they had tried to storm the
16      Capitol that day, if they would have been met with rubber
17      bullets.  And I suspect not.
18          So with regard to the nature of the offense, it was a
19      serious one.  It was an unprecedented one.  And perhaps now,
20      having seen yourself on videotape and media footage, you
21      understand how terrified the rest of the country must have
22      been and the people inside that Capitol must have been when
23      those events were unfolding.
24          With regard to your characteristics as an offender, I've
25      already discussed the fact that you do have a prior criminal

history.  You do have some significant hardships that you have suffered in your life.  And I agree with Mr. Brunvand that those things stay with you, and so much of what happens to us as children affects how we live our lives, how we respond to pressure, how we deal with anger.  And I think Mr. Brunvand is correct that mental health treatment would definitely, I think, help you.

But despite those difficulties, despite your earlier convictions, you have managed to live a productive life. You have managed to raise children who love you and support you, and those are -- that's to your credit.  You're younger than I am.  You're younger than I am, but you still have lots of time before you to continue to live a productive life.

Turning to the types of sentences available, as I stated before, the count to which you pleaded guilty carries a maximum term of 20 years of imprisonment with one to five or no more than three years of supervised release, and there's a restitution and a fine of $250,000.  I've considered those factors, and I've also considered the need to avoid the unwarranted sentence disparity that your lawyer talked about.

I'll say that that factor is probably less weighty than the others, because this was an unusual and unprecedented case, and these are unusual cases.  We have had in this court several defendants sentenced to 41 months and more of time for basically nonviolent offenses, for destruction of property,

1    for coming into the Capitol.  So it's very hard to find a

2    range that is comparable.

3        During the last five fiscal years of 2016 to 2020,

4    there were 21 offenders whose primary guidelines of §2A2.2

5    with a final offense level of 26 and a criminal history

6    category of I, after excluding offenders who received a 5K

7    departure, for 20 offenders, 95 percent of those received

8    a sentence of imprisonment in whole or in part.  The average

9    length of imprisonment was 66 months, and the median length

10   of imprisonment was 49 months.  So that's somewhat of a

11   comparison.

12       The other factors I have to consider that weigh very

13   heavily on me are deterrence.  You know, Mr. Palmer, I've

14   talked about your situation.  You were allowed to leave the

15   Capitol.  You were allowed to go home.  You were allowed

16   to talk to law enforcement.  You were allowed to come here

17   voluntarily and plead guilty, at which point you were stepped

18   back because that was mandatory under the statute you pleaded

19   guilty to.

20       But you have been allowed a lot of leeway that other

21   violent offenders have not been.  You have been given a plea

22   offer to one count when you were charged with several, and

23   the government has allocuted for a sentence at the low end of

24   the guideline range.  So I believe you have gotten significant

25   concessions given the seriousness of your actions.

1    But I have to consider deterrence, and I have to make

2    it clear that the actions you engaged in cannot happen again.

3    Every day we're hearing about reports of antidemocratic

4    factions of people plotting violence, the potential threat

5    of violence, in 2024.

6    It has to be made clear that trying to violently overthrow

7    the government, trying to stop the peaceful transition of

8    power and assaulting law enforcement officers in that effort

9    is going to be met with absolutely certain punishment.  Not

10   staying at home.  Not watching Netflix.  Not doing what you

11   were doing before you got arrested in this case.  That there

12   are going to be consequences.  I am not making an example of

13   you.  I am sentencing you for the conduct that you did.  But

14   one of the things I need to make clear is this is the

15   consequence of those actions.

16   You have already agreed to pay $2,000 in restitution

17   at the government's request, which I think is appropriate.

18   Having considered all of the factors that I must, I believe

19   that a penalty of 63 months of imprisonment, as requested and

20   as recommended by the Probation Office and as requested by

21   the government, is sufficient but not greater than necessary

22   to reflect the seriousness of the instant offense, to promote

23   deterrence, to protect the public from future crimes that

24   may be committed by the defendant, and to avoid unwarranted

25   sentence disparities among defendants convicted of similar

1    crimes.  Therefore, based on my consideration of all 3553(a)

2    factors, I'll now state the sentence to be imposed.

3        Can you stand, please.

4        (Defendant complies.)

5        It is the judgment of this court, that you, Mr. Palmer,

6    are hereby committed to the custody of the Bureau of Prisons

7    for a term of 63 months on Count Three.  You are further

8    sentenced to serve 36 months of supervised release and to pay

9    a $100 special assessment.  You are also ordered to pay $2,000

10   in restitution.  The Court finds that you do not have the ability

11   to pay a fine and therefore waives imposition of a fine.

12       The Court will recommend to the Bureau of Prisons that you

13   be housed in a Bureau of Prisons facility as close to your

14   home in Clearwater, Florida, as possible.  I don't have any

15   authority over the Bureau of Prisons.  I can make recommendations.

16   Where they house you is up to them, but I believe they do

17   factor in my recommendation.  So I'll recommend that.

18       The special assessment of $100 is immediately payable

19   to the Clerk of the Court for the U.S. District Court for

20   the District of Columbia.  Within 30 days of any change of

21   address, you shall notify the Clerk of the Court of the change

22   until such time as the financial obligation is paid in full.

23       The Court will recommend to the Bureau of Prisons that you

24   be housed at a facility that has a residential drug treatment

25   program, that you be allowed access to such a program, and

1   that you be placed in such a program during your term of

2   imprisonment.

3        The Court will also recommend that you be allowed to obtain

4   training as an electrician.  The Court believes that that will

5   help move you forward to a successful rehabilitation.

6        Within 72 hours of release from custody, you shall report

7   in person to the probation office in the district to which

8   you're released.  While on supervision, you shall submit to

9   the collectin of DNA.  You shall not possess a firearm or

10  other dangerous weapon.  You shall not use or possess an

11  illegal controlled substance, and you shall not commit another

12  federal, state, or local crime.  You shall also abide by the

13  general conditions of supervision adopted by the U.S.

14  Probation Office as well as the following special conditions

15  that I will now set forth.

16       Because of your history of struggling with substance abuse

17  and addiction, you shall participate in and successfully

18  complete a residential and/or outpatient substance abuse

19  treatment program, which may include drug testing and

20  detoxification services, as approved by and directed by the

21  Probation Office.  You shall also submit to substance abuse

22  testing as approved and directed by the Probation Office.

23  You shall also submit to mental health treatment as directed

24  by the Probation Office since the Court believes that that is

25  one of the issues that has perhaps led you to be here today,

1    and mental health treatment is going to be a vital part in

2    your eventual rehabilitation.

3        Probation Office shall release the presentence investigation

4    report to all appropriate agencies in order to execute the

5    sentence of the Court.  Treatment agencies shall return the

6    presentence report to the Probation Office upon Mr. Palmer's

7    termination or completion of treatment.

8        Mr. Palmer, pursuant to 18 U.S.C. § 3742, you have a

9    right to appeal the sentence imposed by this court subject

10   to certain rights of appeal you waived as part of your plea

11   agreement in this case.  If you choose to appeal, you must

12   file an appeal within 14 days after the court enters judgment.

13   If you are unable to afford the cost of an appeal, you may

14   request permission from the court to file an appeal without

15   cost to you.

16       As set forth in the plea agreement, the government pledged

17   to moved to dismiss the indictment against Mr. Palmer, the

18   remaining counts of the indictment.  Does the government wish

19   to do so now?

20            MR. JUMAN:  Yes, Your Honor, the remaining counts.

21            THE COURT:  All right.  The motion is granted.

22       Are there any objections to the sentence imposed not

23   already on the record, Mr. Brunvand?

24            MR. BRUNVAND:  No, Your Honor.

25            THE COURT:  Mr. Juman?

1    MR. JUMAN:  No, Your Honor.

2    THE COURT:  Mr. Palmer, you've expressed remorse,

3 and by all appearances, it appears to be genuine.  I hope it

4 is.  I can't tell.  I can't look into your heart or your mind,

5 but what I can tell you is this:  The way you conduct your

6 life after this case is going to speak volumes about whether

7 you are truly remorseful.

8  And you may or may not be, and I don't have any control

9 over that.  But you have children here, and you appear to be

10 a devoted father, and I will say this to you:  How you come

11 back from this -- everyone makes mistakes, some big and some

12 small.  And you made a big one.  You've made a big one.  But

13 your children are here for you, and they are watching you.

14 And they're going to watch to see how you conduct your life

15 after this, and it is the way we pick ourselves up from our

16 mistakes that shows your true character.

17  So I encourage you to make the most of your time, both

18 while incarcerated and after incarceration, just show your

19 children that while we make mistakes and we can do bad things,

20 that does not make us irredeemable people.  So good luck to

21 you, sir.

22    THE DEFENDANT:  Thank you, Your Honor.

23    PROBATION OFFICER:  Your Honor?

24    THE COURT:  Yes, Mr. Walters.  Come on up.

25    PROBATION OFFICER:  Robert Walters with Probation.

1       As to the restitution, I don't believe a payment schedule

2    was ordered, which, if you'd like, Probation can make that

3    determination.

4           THE COURT:  I would like that.  Thank you.

5       Do you have any objection, Mr. Juman?

6           MR. JUMAN:  No, Your Honor.

7           THE COURT:  Mr. Brunvand?

8           MR. BRUNVAND:  No, Judge.

9           PROBATION OFFICER:  However, I would request, so that

10   we can accurately make a determination as to what he can pay,

11   that you order financial disclosure and financial restrictions

12   just so we can have access to his finances to determine what

13   he can in fact pay.

14          THE COURT:  Well, I usually impose those in cases where

15   there's been fraud or some kind of financial malfeasance, and

16   Probation did conduct a financial -- did check his accounts

17   with regard to his ability to pay a fine.

18      Mr. Brunvand, do you have a position on this?

19          MR. BRUNVAND:  I can tell the Court and Probation that

20   my client has no money.

21          THE COURT:  I have waived imposition of a fine.  I was

22   told by Mr. Brunvand at the plea that Mr. Palmer has sold all

23   his assets and is prepared -- but wait a second, Mr. Brunvand.

24   I believe you said you had some resources in escrow for

25   payment of the restitution.

1          MR. BRUNVAND:  Yes.  The 2,000 I have.  And I'm leaving

2     for Ukraine on Sunday and then Norway.  I won't be back until

3     January, but when I get back from my office, I can mail --

4          THE COURT:  All right.  It sounds like we don't need a

5     schedule.

6          PROBATION OFFICER:  That's fine.

7          THE COURT:  So, Mr. Brunvand, when you get back after

8     the holidays, if you could simply make the payment and provide

9     notification to the Probation Office.  All right.  Thank you.

10    So we don't need to do that.  Anything else?

11         MR. JUMAN:  Not from the government, Your Honor.

12         MR. BRUNVAND:  No, Your Honor.

13         THE COURT:  All right.  Somebody's waving their hand.

14    Is that your daughter?

15         FAMILY MEMBER:  Can I give my dad a hug?

16         THE COURT:  That's up to the marshals.  I know

17    it's very hard, but the marshals have their rules for our

18    protection, and they can't do it.

19       Good luck, Mr. Palmer.

20         THE DEFENDANT:  Thank you, ma'am.

21       (Proceedings adjourned at 1:58 p.m.)

22

23

24

25

\*   \*   \*   \*   \*   \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Bryan A. Wayne
Bryan A. Wayne