UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, )
)                   Case No. 1:21-cr-00328-TSC-1
v.                                        )
)
ROBERT PALMER,                )
)
    Defendant.            )
_____ )

**MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. §3582**

**To: The Honorable Tanya S. Chutkan**
*District Court Judge for the District of Columbia*

## I.    Introduction

The Defendant, Mr. Robert Palmer, is a middle-aged man, Navy Veteran, and father of four adult children who presents himself before this Court seeking compassionate release. With the exception of a couple of minor charges from long in his past, he has lived a life completely removed from the criminal justice system and has productively contributed to his community. Despite a young life impacted by abuse and sexual trauma, Robert was able to maintain a meaningful and good, if not always easy, life. However, on January 6, 2021, Robert unexpectedly found himself in a political maelstrom of historical significance. He found himself prosecuted by the same government he served as an enlisted man in the Navy.

A man of strong opinions and values, Robert still deeply loves his government and acted, in his own mind at the time on January 6, 2021, to protect it. He has come to recognize how dangerous and misguided his conduct was. During the course of his incarceration, Robert has reflected deeply on his actions and has accepted his prison sentence as a learning experience about his own character and the dangerousness of being swept up in volatile groupthink.

Candidly, Robert is still someone who has strong political views, as do many Americans in this complex political environment. However, through his experience while incarcerated and in his reflections about his actions, Robert is also someone who is now more attuned than ever to the racial and economic disparities that unfortunately constitute the architecture of our criminal justice system. While housed in the BOP facility at Coleman Low in Florida, Robert has met other inmates with extraordinarily disparate backgrounds and life experiences, all of whom have taught him valuable lessons.

Robert Palmer is a deeply empathetic and kind person. His actions on January 6, 2021, were fueled by his misapprehension (although pushed through social and legitimate media sources incessantly during this time frame by those who still remain free) that our Presidential Election had been stolen. Grafted atop a childhood of trauma and abuse, the energy of that day fueled Robert in a way that was

uncharacteristic and dangerous. For that he is being punished. However, that terrible day does not reflect the true measure of Robert's character. Today, he spends time with others who are different from him, socializing and listening to their stories of their lives and circumstances. It has been an eye-opening experience as Robert relates to the Court in his letter attached to this motion.

Robert respectfully asks this Court to exercise its discretion in granting him compassionate release. The grounds he asks this Court to consider are his battery of medical conditions and deteriorating health, along with his extraordinary post-sentencing rehabilitation and his prison sentence relative to others who have also received sentences for similar conduct from the events of January 6, 2021.

There has never been a prosecution like the one undertaken by the Department of Justice regarding these events. To date, seven hundred and eight defendants have been sentenced for various offenses and more continue to be prosecuted[1]. Given the sheer number of cases prosecuted for the events of January 6, 2021, and which will almost certainly never be repeated, this Court should take the opportunity to reassess earlier imposed sentences in light of subsequent developments and information developed in these cases to give effect to the Federal Sentencing Guidelines' mandate that a sentence be no greater than necessary to achieve its goals.

---

[1] This date is accurate as of November 6, 2023, according to the Department of Justice's website.

## II.    Legal Principles

As amended by the First Step Act, 18 U.S.C. §3582(c)(1)(A) authorizes courts

to modify terms of imprisonment as follows:

> The court may not modify a term of imprisonment once it has been imposed except that—in any case—the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i)    Extraordinary and compelling reasons warrant such a reduction… and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Therefore, to be entitled to relief under 18 U.S.C. §3582(c)(1)(a)(i), Robert

must meet both the exhaustion requirement and demonstrate that "extraordinary

and compelling reasons" warrant a reduction of his sentence.  Moreover, the court

must be satisfied that the defendant "is not a danger to the safety of any other person

or to the community." Sentencing Guideline § 1B1.13. The court must also weigh

the prospect of release against the interests of continued incarceration—namely, deterrence, punishment, and incapacitation. *See* 18 U.S.C. § 3553(a). Thus, the Act incorporates a sense of compassion and humanity not previously embraced by the

federal criminal justice system. *Accord United States v. Copeland*, 2020 WL 2537250, at *2 (E.D.N.Y. May 19, 2020).

*Exhaustion*

Robert has satisfied the exhaustion requirements for a compassionate release petition. He submitted a written request for compassionate release or a reduction in sentence to the Bureau of Prisons on February 27, 2023. The request was denied March 09, 2023. The documentation of Mr. Palmer's request and denial by the Bureau of Prisons are attached as exhibits to this petition.

Therefore, a motion of compassionate release is appropriate for the Court to consider at this time.

*Extraordinary and Compelling Reasons*

**A. Medical Circumstances of the Defendant**

United States Sentencing Guidelines (USSG) policy statement §1B1.13(b)(1)(B) provides that an extraordinary and compelling reason for release is present when the defendant is:

(i)     [S]uffering from a serious physical or medical condition,
(ii)    [S]uffering from a serious functional or cognitive impairment, or
(iii)   [E]xperiencing deteriorating physical or mental health because if the aging process,

that substantially diminished the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

§1B1.13(b)(1)(B).

In a report based on interviews with Robert and a review of his medical records, by Wendy Olson, R.N., M.S.N.-M.A., the serious nature of Robert's debilitating conditions and resulting deteriorating health is apparent. *See* Robert Palmer Medical Report by Wendy Olson dated January 14, 2024, attached to this motion.

Prior to Robert's arrest in February 2021, he suffered a stroke in January 2000. *Id*. This stroke has caused long term residual conditions including depression, dizziness, short and long-term memory loss, and dysphagia which results in aspiration of his meals into his lungs. *Id*. In addition, his prior diagnoses include serious anxiety and depression from abuse suffered in childhood, Gastroesophageal Reflux Disease (GERD), foot and groin pain, hiatal hernia, and bilateral inguinal hernia. *Id*. Before his arrest and entering the BOP, Robert was taking medications for GERD and daily Aspirin. *Id*.

However, since his arrest and imprisonment, Robert has experienced a remarked decline in health. He has been prescribed a battery of new medications and was diagnosed with both Type 2 Diabetes, Sleep Apnea, and issues involving his prostate and bladder. *Id*. In addition, his incarceration has worsened his already severe anxiety and depression which Robert reports have caused memory loss, "blackouts", and increased symptoms related to his dysphagia which included waking up

in the middle of the night from choking and drooling. *Id*. Robert has not received medical attention and treatment for memory loss and black outs which further cause worry to both Robert and his family. *Id*.

Due to his status as a stroke survivor and the comorbidity of his Type 2 Diabetes diagnosis, Robert is at high risk for life-threatening blood clots and changes in blood pressure. *Id*. He is also at risk of decreased oxygen to his brain from sleep apnea, as well as additional strokes, which also are life-threatening. *Id*. As a result of all these conditions, Robert needs to be under the care of, and have regular access to, a neurologist, cardiologist and nephrologist for management of his conditions. *Id*.

This type of specialized and regular care cannot be guaranteed by the BOP and therefore exist as an extraordinary and compelling reason to grant Mr. Palmer relief at this time.

Several other courts have considered the deteriorating health of inmates as an extraordinary and compelling reason for consideration of compassionate release. *United States v. Greene*, 516 F.Supp.3d 1, 22 (D.D.C. 2021) (finding that "medical conditions that 'impair' a defendant's 'basic human functions plainly suffice" as a reason for compassionate release."); *United States v. Sitzmann*, 2022 WL 884179 at *4 (granting compassionate release to an inmate "whose medical needs are complex" despite Government's contention that some of inmate's medical conditions

were stable.); *United States v. Ebbers*, 432 F.Supp.3d 421,428 (S.D.N.Y. 2020) (finding that "a defendant need not have lost all ability to provide self-care or be suffering from a terminal illness to qualify for relief..."); *United States v. Danson*, 2020 WL 3467887 at *3 (granting compassionate release due to Defendants "undiagnosed health condition, personal history, individual characteristics" along with family support and no prior violent history.).

## B. Disproportionate Sentencing

Robert's sentence was disproportionate to that of other January 6th defendants and as such, is an extraordinary and compelling reason to grant him release. Mr. Palmer was one of the very first defendants involved in the January 6th riots to plead guilty. *See* Sentencing Memorandum p. 31. He immediately cooperated with law enforcement fully. *Id*. He consented to a search of his cell phone. *Id*. He gave a full confession to federal agents. *Id*. He decided to plead guilty quickly and did so before seeing what other sentences fellow co-defendants would receive. *Id*. His sentence was longer compared to his similarly situated defendants who followed him.

### i.    Similar Defendants to Mr. Palmer

Robert was sentenced to 63 months after his guilty plea. Devlyn Thompson, for example, had similar factual allegations to Robert. Thompson assaulted a police officer with a metal baton. Nik Popli and Julia Zorthian, *What Happened to the Jan. 6*

*Rioters Arrested Since the Capitol Attack*, Time (May 26, 2023), https://time.com/6133336/jan-6-capitol-riot-arrests-sentences. He also tried to throw a speaker at the police but missed and ended up injuring another rioter. *Id.* Thompson later pleaded guilty to assault with a dangerous weapon and was sentenced to 46 months in prison with credit for time served, along with 36 months of supervised release and a required payment of $2,000 in restitution. *Id.*

Nicholas Languerand threw various objects at officers with the U.S. Capitol Police and Metropolitan Police Department, including an orange traffic barrier and two stick-like objects. *Id.* Prosecutors claimed the items were capable of inflicting serious bodily injury based on the size and weight of the objects, as well as the speed and force with which Languerand threw them. *Id.* During his trial, investigators said he showed little remorse and indicated that he wanted to see more violence, alleging he had sent a message to an associate that read, "[v]iolence isn't always the answer but in the face of tyranny violence may be the only answer," and "[n]ext time we come back with rifles." *Id.* Languerand, at his sentencing, pleaded guilty in November 2021 to assaulting, resisting, or impeding officers with a dangerous weapon. *Id.* He was sentenced to 44 months in prison, followed by a mandatory two years of supervised release. *Id.* He was also ordered to perform 60 hours of community service and to pay $2,000 in restitution. *Id.*

Jacob Anthony Chansley is one of the most recognizable rioters, thanks to viral photographs of his clothing. *Id.* Chansley confessed to federal agents that he was the man photographed in former Vice President Mike Pence's chair on the Senate dais with his face painted, wearing a horned headdress and no shirt. *Id.* Chansley pleaded guilty to one charge: obstruction of an official proceeding. *Id.* He was sentenced to 41 months in prison. *Id.* He was released early and sent to a reentry center and according to the BOP website, he was released on May 25, 2023.  According to an NPR article, he was released early due to his good behavior. Juliana Kim, *U.S. Capitol rioter the 'QAnon Shaman' is released early from federal prison*, NPR (March 31, 2023), https://www.npr.org/2023/03/31/1167319814/qanon-shaman-jacob-chansley-capitol-riot-early-release-reentry.

Hunter Seefried illegally entered the Capitol grounds and joined a crowd of rioters heading up the steps of the building. People near Hunter Seefried and his father, Kevin Seefried, broke windows with a police shield and a wooden two-by-four, and Hunter Seefried cleared a large piece of glass from one of those windows to clear the way. After the glass was broken, the Seefrieds and many others entered the building, and they were among the first people to enter the Capitol on January 6. While in the building, both defendants were part of a larger group of individuals who verbally

confronted several U.S. Capitol Police officers near the entrance to the Senate Chambers.

Both Hunter Seefried and his father were found guilty after a bench trial of the felony offense of obstruction of an official proceeding, and four misdemeanor offenses, including entering and remaining in a restricted building or grounds; disorderly and disruptive conduct in a Capitol Building; disorderly conduct in a Capitol Building, and parading, demonstrating, or picketing in a Capitol Building. Judge McFadden acquitted Hunter Seefried of three other related charges. He was sentenced to 24 months in prison.

Scott Kevin Fairlamb climbed on inauguration scaffolding, pushed a police officer into a group of people, and punched the officer's face shield. Nik Popli and Julia Zorthian, *What Happened to the Jan. 6 Rioters Arrested Since the Capitol Attack*, Time (May 26, 2023), https://time.com/6133336/jan-6-capitol-riot-arrests-sentences. He also entered the Capitol. *Id.* He plead guilty in August 2021 to assaulting an officer and obstructing an official proceeding of Congress. *Id.* He was sentenced to 41 months in prison, with credit for time served, and ordered to pay $2,000 in restitution for damages to the building. *Id.* According to the BOP website, he was released on June 8, 2023.

Matthew Ryan Miller draped himself in a Confederate flag and threw objects at police officers and scaled the walls of the Capitol building. *Id.* He threw a full beer can and batteries in the direction of law enforcement. *Id.* He also sprayed a fire extinguisher directly into the tunnel onto police officers. *Id.* After scaling the Capitol wall using a metal barrier as a ladder, Miller urged others in the mob to join him. *Id.* He assisted rioters, waved his hands and said multiple times "Come on" as the crowd chanted "Heave! Ho!" *Id.* He also urged the mob to help him push against law enforcement officers on the Lower West Terrace, putting up his fingers and yelling "One, two, three, push!" multiple times. *Id.* He received 33 months in prison with 24 months of supervised release and must pay $2,000 in restitution. *Id.* He must also complete 100 hours of community service. *Id.*

Alan Byerly purchased a stun gun and took it with him to participate in these events. He attacked a reporter with three other individuals and used his stun gun against law enforcement. He pleaded guilty to assaulting an officer and merely received a sentence of 34 months in prison with three years of supervised release and two thousand dollars of restitution. Douglas Jensen proceeded to trial and was found guilty of all seven charges against him, including assaulting an officer and only received 60 months after being found guilty.

Other defendants who pleaded guilty to assaulting an officer with a dangerous weapon received the following active sentences:

- **Cody Mattice-** 44 months (sprayed a chemical agent on law enforcement officers).[2]

- **James Mault-** 44 months (sprayed a chemical agent on law enforcement officers).[3]

- **Mark Mazza-** 60 months (assaulted law enforcement and illegally carried a firearm with him).[4]

- **Marshall Neefe-** 41 months (hoisted and pushed a large metal "TRUMP" sign into a defensive line of law enforcement).[5]

- **Howard Richardson-** 46 months (forcibly struck a law enforcement officer with a metal flagpole three times).[6]

---

[2] *See* https://www.justice.gov/usao-dc/pr/two-men-sentenced-prison-assaulting-law-enforcement-officers-during-jan-6-capitol-breach.

[3] *See* https://www.justice.gov/usao-dc/pr/two-men-sentenced-prison-assaulting-law-enforcement-officers-during-jan-6-capitol-breach.

[4] *See* https://www.justice.gov/usao-dc/pr/indiana-man-sentenced-prison-carrying-gun-and-assaulting-law-enforcement-officers-jan-6.

[5] *See* https://www.justice.gov/usao-dc/pr/two-pennsylvania-men-sentenced-41-month-prison-terms-assaulting-officers-during-jan-6.

[6] *See* https://www.justice.gov/usao-dc/pr/pennsylvania-man-sentenced-prison-assaulting-officer-during-jan-6-capitol-breach.

- **Troy Sargent**- 14 months (struck a law enforcement officer).[7]

- **Ricky Willden-** 24 months (sprayed officers with a chemical irritant).[8]

- **Duke Wilson**- 51 months (struck officers with a PVC pipe).[9]

- **Phillip Young-** 8 months (lifted and pushed a metal bicycle rack into a wall of officers).[10]

- **Kevin Douglas Creek-** 27 months (struck and kicked an officer).[11]

- **Lucas Denney-** 22-52 months (hit an officer and pulled him down the steps).[12]

- **Logan Barnhart-** 36 months (drug an officer and beat him with a pole).[13]

---

[7] *See* https://www.justice.gov/usao-dc/pr/massachusetts-man-sentenced-assaulting-law-en-forcement-officers-jan-6-capitol-breach.

[8] *See* https://www.justice.gov/usao-dc/pr/california-man-sentenced-two-years-prison-assault-ing-officers-during-jan-6-capitol-breach.

[9]*See* https://www.justice.gov/usao-dc/pr/idaho-man-sentenced-to51-months-prison-assaulting-law-enforcement-and-obstruction-capitol.

[10]*See* https://www.justice.gov/usao-dc/pr/new-jersey-man-pleads-guilty-assaulting-officers-and-other-charges-actions-during-jan-6.

[11] *See* https://www.justice.gov/usao-dc/defendants/creek-kevin-douglas.

[12] *See* https://www.justice.gov/usao-dc/pr/texas-man-sentenced-prison-assaulting-law-enforce-ment-officers-during-jan-6-capitol.

[13] *See* https://www.justice.gov/usao-dc/pr/michigan-man-sentenced-assaulting-officers-during-jan-6-capitol-breach-0.

A number of defendants have pleaded guilty but have yet to be sentenced as well according to the Department of Justice's website.

Approximately 708 federal defendants have had their cases adjudicated and received sentences for their criminal activity pertaining to the Capitol Riot. *34 Months Since the Jan. 6 Attack on the Capitol,* United States Department of Justice (as of November 6, 2023) https://www.justice.gov/usao-dc/33-months-jan-6-attack-capitol-0. Approximately 428 have been sentenced to periods of incarceration. *Id.* Approximately 134 defendants have been sentenced to a period of home detention, including approximately 20 who also were sentenced to a period of incarceration. *Id.* A total of 86 of those who have pleaded guilty to felonies have pleaded to federal charges of assaulting law enforcement officers. *Id.* An additional 41 individuals have pleaded guilty to felony obstruction of law enforcement during a civil disorder. *Id.* Of these 127 defendants, 106 have now been sentenced to prison terms of up to 151 months. *Id.*

This Court should reassess Palmer's sentence in light of the other similarly situated defendants' sentences and bring it more in line with the punishments they received. *See United States v. McCoy*, 981 F.3d 271 (4th Cir. 2020) (recognizing that district courts are empowered to consider any extraordinary and compelling reason for release that an inmate may raise, including the severity of a sentence and the

disparity between that one and the one that would be imposed today); *United States v. Smith*, 836 Fed. Appx. 149, 153 (4th Cir. 2020); *United States v. Thomas*, Crim, JKB-97-03553-3 (D. Md. Nov. 15, 2022); *United States v. Lugo*, 01-cr-922 (E.D.N.Y. March 11, 2022) (noting the court may consider disparities between co-defendants in choosing the appropriate sentence); *United States v. Cogswell*, No. 1:11-cr-00205-JAW-8 (D. Me. March 15, 2021) (reducing sentence to time served (124 months) to make sentence more consistent with co-conspirators).   Respectfully, this Court should substantially reduce Palmer's sentence to bring it more in line with those of these other defendants.

Furthermore, Mr. Palmer was not given the benefit of accepting responsibility. This Court ruled that Mr. Palmer's fundraising page his friend set up for his legal fees with a false narrative of what happened that day on the page demonstrated he was not in fact accepting responsibility for his actions, rather, he was arguing he acted in self-defense. *See* Sent. Tr. p. 13. When confronted about the website, Mr. Palmer had the site taken down, returned all the money to those who donated, stated in court that he had lied on the website, and repeated that he did not act in self-defense, and he was taking responsibility for his actions by pleading guilty. *Id*. at 12. Yet, he was denied the two points he should have received for quickly cooperating with law enforcement, pleading guilty, and accepting responsibility by choosing to plead guilty,

not proceeding to trial, and admitting that he was in fact guilty. This would have changed his sentencing range from 63-78 months to 51-63, with the Government recommending a sentence on the lower spectrum of the sentencing guidelines, this would be the sentence more akin to those of his similarly situated defendants.

He was not the only January 6th defendant who set up websites asking for donations to pay for legal fees. "Among the approximately 800 individuals who have been arrested and charged with participating in the Capitol riot, there are more than 100 crowdfunding campaigns that are soliciting donations for legal bills and other expenses." Teddy Wilson, *Give Send Riot: Jan. 6 Defendants Have Raised More than $3.5 Million Through Christian Crowdfunding Website*, Rolling Stone (April 11, 2022), https://www.rollingstone.com/politics/politics-features/give-send-riot-jan-6-defendants-have-raised-more-than-3-5-million-through-christian-crowdfunding-website-1332787/. "Many of the crowdfunding campaigns are based on narratives of martyrdom – proclamations of innocence next to claims of persecution against 'patriots.' The rhetoric echoes then-President Donald Trump referring to 'great patriots' upset about the election on Twitter the day of the attack." Jessica Schneider and Hannah Rabinowitz, *Capitol riot defendants raise more than $2 million from crowdfunding*, CNN (Sept. 1, 2021), https://www.cnn.com/2021/09/01/politics/capitol-riot crowdfunding/index.html.

Additionally, Mr. Palmer has used his time in the Bureau of Prisons productively and has demonstrated remarkable rehabilitative efforts since his incarceration. He has completed the following programs and courses since his incarceration began:[14]

1. The *Threshold Program*- October 1, 2022.[15]

2. *Veterans Soldier On*- January 18, 2023.

3. Veteran's Service Fit-October 06, 2022.

4. Veteran Resilience Support Group-October 12, 2022.

5. Drug Abuse Education course- April 07, 2023

6. Basic Cognitive Skills- August 23, 2023.

Clearly, he has taken advantage of every opportunity presented to him while in the Bureau of Prisons to better himself. He has also demonstrated his exceptional work ethic with the jobs available at the Bureau of Prisons. From a letter dated September 02, 2022, an employee of the BOP wrote a memorandum commenting on Mr. Palmer's outstanding work ethic and his exceptional work product and excellent

---

[14] All certificates are attached to this petition as exhibits.

[15] According to the BOP, "[t] he Threshold Program helps inmates open the door to a life of understanding and growth. Over a period of 6 months, Chaplains assist a group of religiously and culturally diverse inmates address issues that are critical to a successful life in the community after release. Some inmates enter the program with no professed faith and others are deeply religious, but all receive guidance and instruction on many different religions and beliefs." *See* https://www.bop.gov/resources/news/20160523_inmates_embrace_threshold.jsp (May 23, 2016).

attitude. He has also had the honor of being chosen as a UNICOR employee within the Bureau of Prisons working in shipping. He has used his time productively in the BOP and been an exemplary prisoner. As mentioned above, this time spent in prison with individuals vastly different from himself has also opened his mind and expanded his worldview. During his sentencing hearing, his counsel pointed out to this Court that Mr. Palmer had accepted the COVID-19 vaccine while incarcerated. *See* Sent Tr. p. 34. This Court took particular notice of that behavior as unusual of the fellow January 6th defendants and commended Mr. Palmer on his decision to accept the vaccine. *Id*. at 34-35. This is just one small act that demonstrates the open-mindedness Mr. Palmer now possesses and how this time in the BOP has changed him.

Finally, there is no question that Mr. Palmer "is not a danger to the safety of any other person or to the community." Sentencing Guideline § 1B1.13. Mr. Palmer is a nearly 57-year-old father and businessman. He has been a productive member of society for decades. He ran a successful flooring company for many years. He has a criminal history from when he was a young person but no criminal history in decades-the most recent conviction occurred thirty years ago. This was an isolated event, which was extremely emotionally charged, and surrounded by the chaos of others acting violently and irrationally all around him. It was an isolated and rare event

unlikely to occur again. He is not a danger to the safety of any other person or the community if released.

## III.    §3553(a) Factors

On March 12, 2021, Palmer was charged by complaint with violating 18 U.S.C. §§ 111(a)(1) and (b), 231(a)(3), 2, and 1752(a)(1), (2), and (4) and (b)(1)(A). (ECF 1). On March 17, 2021, he voluntarily surrendered to law enforcement. (ECF 5). On April 28, 2021, a federal grand jury indicted Palmer and charged him with the same crimes as well as violations of 40 U.S.C. §§ 5104(e)(2)(D) and (F). (ECF 11). In July, Palmer, through counsel, indicated a desire to plead guilty. As noted, his guilty plea was entered on October 4, 2021, and Palmer was remanded into custody. (ECF 24) He plead guilty to count three of the indictment- assaulting, resisting, or impeding certain officers using a dangerous weapon in violation of 18 U.S.C. §§ 111(a)(1) and (b). (ECF 24) He was sentenced to 63 months in prison with an additional term of 36 months of supervised release by this Honorable Court. *See* Sent Tr. p. 46.

In considering Mr. Palmer's request for compassionate release, this Court is required consider the §3553(a) factors.  Analysis of these factors militates in favor of granting Mr. Palmer some sentencing relief.

### A.    Nature and circumstances of the offense

There is no question that Mr. Palmer's offenses were extremely serious as he conducted himself in a very dangerous manner on that date.  People were injured, and property was damaged. However, in considering Robert's culpability, this Court should further consider how deeply uncharacteristic his behavior was on that date to his normal behavior and how his conduct was urged on by others who have not— still, to this day- been held accountable for their roles in these events. This Court should further consider that Mr. Palmer's offense was an isolated, unique situation involving large amounts of people, actively encouraged by others to achieve their own goals.  But for the actions of others, Robert Palmer would not have been at the Capitol building engaging in this conduct.  As this Court is aware, having reviewed Robert's PSR, Robert's childhood history of significant trauma placed him in a uniquely vulnerable position to overreact to the stress and trauma that occurred on that day.

**B.    History and Characteristics of the Defendant**

Mr. Palmer is a man with both mental and physical health concerns. These concerns, frankly, were not sufficiently explored during his guilty plea or sentencing, but his confidential PSR contains much of this history for this Court's continued consideration.  He had a stroke a number of years ago. The stroke has affected the way he thinks and his short-term memory. He has Type 2 Diabetes, Major

Depressive Disorder, Edema, Esophageal problems, and sleep apnea. He is a father of four adult children. He is divorced but amicably co-parents with his ex-wife. Prior to this incident he ran a successful flooring business. While out on release for the instant offense, he complied with all the conditions of his release. *See* Sentencing Memorandum p. 31. He turned himself in to law enforcement, consented to a search of his cellphone, and provided a full confession to federal agents. *Id*. He was also one of the very first defendants in the January 6th riot to plead guilty. *Id*.

### C.   The Need for the Sentence Imposed

> i.   *Reflect the seriousness of the offense, promote respect for the law, provide just punishment.*

Granting compassionate release to Mr. Palmer does not undermine the value of the comparatively lengthy sentence he was initially given compared to the other defendants involved.  Instead, it acknowledges the value of mercy and compassion in our criminal justice system and offers relief from a disproportionate sentence.

> ii.   *Afford adequate deterrence to criminal conduct and protect the public from future crimes.*

Granting compassionate release to Mr. Palmer will not undermine the deterrent effect of his initial sentence, nor should this Court be concerned that Mr. Palmer is a threat to the public. Mr. Palmer has to date been incarcerated for over two years which will certainly have a deterrent effect on Mr. Palmer to never engage in this

type of behavior again. Furthermore, his criminal history is extremely far removed and this was an isolated, unique incident that is extremely unlikely to occur again. He is not a threat to the community.

>    iii.   *Provide the defendant with training, care, or treatment in the most effective manner.*

Mr. Palmer's physical and mental health needs will be reliably and efficiently met when he is at home with his family. He is not receiving adequate physical or mental health treatment while incarcerated and his needs will be better met when he is at home.

## D.   Kinds of sentences available

In addition to incarceration, this Court has a wide variety of sentencing tools available to address the retributive and rehabilitative goals of sentencing under Section 3553(a), including home confinement, community service, and supervision. This Court should, at this point in Mr. Palmer's life and sentence, consider one of these alternatives to incarceration.

## E.   Need to avoid unwarranted disparities in sentencing

Granting compassionate release to Mr. Palmer at this stage in his sentence will not create any unwarranted disparities in sentencing. In fact, it will align his sentence more closely with those of his co-defendants who pleaded guilty and were sentenced *after* him.

## IV.    Mr. Palmer's Release Plan

Upon release, Mr. Palmer will live with his friend, Jodi Fletcher, in Tampa Florida. *See* Fletcher Affidavit. She has no criminal record, has a full-time job where she has been employed for nine years, and lives in an apartment that she has rented for the past 4 years. Because he worked for himself, his business is no longer operational and he will have to secure employment elsewhere upon his release from prison. He plans to spend more time with his children upon his release. He regrets missing his son's graduation from the University of Florida while he was in prison but is extremely proud of his son's achievements. He talks to his son regularly and is looking forward to being able to spend more time with him.

## V.    Conclusion

In combination with his rapidly deteriorating health, Mr. Palmer's sentence is disproportionately greater than his similarly situated fellow January 6th defendants. He has demonstrated remarkable rehabilitation while incarcerated and taken full advantage of every opportunity presented to him in the BOP. He respectfully asks this Court to grant him compassionate release.

Counsel has conferred with Robert Juman of the U.S. Attorney's Office and he is opposed to this motion.

Respectfully submitted,

/s/ Elizabeth Franklin-Best
Elizabeth Franklin-Best, P.C.
3710 Landmark Drive
Columbia, South Carolina 29204
(803) 445-1333
elizabeth@franklinbestlaw.com

January 19, 2024

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this motion on Robert Juman of the U.S. Attorney's Office by filing via ECF on this date, January 19, 2024.

/s/ Elizabeth Franklin-Best